477 S.E.2d 525

**Edward MALLAMO, Plaintiff Below, Appellant,**

v.

**The TOWN OF RIVESVILLE, a Municipal Corporation; Albert Wilson, as a Police Officer for the Town of Rivesville; Clifford Van Pelt, as a Member of the Marion County Sheriff's Department; Junior Slaughter, as Sheriff of Marion County; and the Marion County Commission, Defendants Below, Appellees.**

No. 22906.

Supreme Court of Appeals of
West Virginia.

Submitted Jan. 17, 1996.

Decided May 21, 1996.

Brent E. Beveridge, S. Sean Murphy, Fairmont, for Appellant.

Tamara J. DeFazio, Furbee, Amos, Webb & Critchfield, Fairmont, for Town of Rivesville and Albert Wilson.

McHUGH, Chief Justice:

This is an appeal from orders entered in the Circuit Court of Marion County, dismissing the Town of Rivesville and its police

chief, Albert Wilson, from an action for damages instituted by plaintiff Edward Mallamo. This Court has before it the petition for appeal, all matters of record and the briefs and argument of counsel. For the reasons discussed below, the October 21, 1994 order dismissing Police Chief Wilson is reversed while the December 6, 1994 order dismissing the Town of Rivesville is affirmed.

## I.

On or about July 15, 1988, plaintiff Edward Mallamo was arrested on a highway in the Town of Rivesville by its police chief, Albert Wilson, for speeding and driving on a suspended license. Plaintiff was subsequently convicted in magistrate court of driving on a suspended license and on July 13, 1990, received notice that he was to appear in Marion County Circuit Court on July 17, 1990 to prosecute the appeal of his conviction. According to plaintiff, he was working in Grant County on the scheduled date of trial and was, therefore, unable to give his employer sufficient notice of his scheduled court appearance in Marion County. Consequently, when plaintiff subsequently failed to appear at his trial, the circuit judge issued a capias calling for apprehension of the plaintiff for failure to appear.

On Friday, July 20, 1990, plaintiff returned to his home in Fairmont, Marion County. En route to Fairmont, plaintiff telephoned his lawyer to inquire about the status of his case and learned that his lawyer's attempt to continue the case was unsuccessful and, further, that if a capias had been issued for plaintiff's failure to appear, he was subject to arrest and incarceration over the weekend should he be apprehended in Marion County.

That afternoon, Wilson drove by plaintiff's home and observed plaintiff's car in the driveway. He then contacted the Marion County Sheriff's Department and requested assistance in serving the capias on plaintiff. Wilson subsequently met Marion County Deputy Clifford Van Pelt in a nearby parking lot and the two drove their vehicles to the plaintiff's home.

Upon arriving at plaintiff's home, Wilson and Van Pelt noticed that the keys were in the ignition of plaintiff's car and that the

hood of the car was hot. They further observed that lights were on in the house and that the front door was slightly ajar. Van Pelt testified that he heard a male voice from inside the house. Believing that someone was in plaintiff's house, Wilson and Van Pelt knocked on the door and identified themselves as law enforcement officers. However, plaintiff failed to answer. Plaintiff testified that when he saw the officers drive up to his home, he proceeded to the basement, believing that the officers would simply go away.

Van Pelt subsequently contacted Marion County Central Communications from the radio in his cruiser and requested that a dispatcher contact the Marion County Prosecutor's Office to advise the officers on whether they should enter the plaintiff's home. The dispatcher indicated to Van Pelt that the prosecuting attorney on-call had advised the officers not to enter the home, but to either wait for plaintiff to come out or to obtain a search warrant. In the meantime, Van Pelt's supervisor, Sergeant Robert E. Wolford, who was on patrol in his cruiser, overheard the conversation between Van Pelt and the dispatcher. Sgt. Wolford disagreed with the prosecuting attorney's advice and immediately contacted Van Pelt directly. Sgt. Wolford told Van Pelt that if he had reason to believe plaintiff was in the house, the officers could enter the house even if they had "to kick the door in." Wilson, who was standing several feet from Van Pelt's cruiser, has testified that while he heard Sgt. Wolford's directive to enter plaintiff's home, he did not hear the dispatcher's message advising against it.

Van Pelt and Wilson subsequently entered plaintiff's home through the partially-opened front door. According to Van Pelt, they, again, identified themselves as law enforcement officers and requested that plaintiff come to the front of the house. When the officers received no response, they began searching plaintiff's home. Upon observing a high-powered rifle in the corner of an upstairs' bedroom, the officers unholstered their weapons. The officers eventually proceeded to the dark basement where plaintiff, fearing arrest, had concealed himself in a storage closet. According to plaintiff's testi-

mony, he was holding the closet door closed and, through the crack between the door and the doorframe, could see Van Pelt holding his weapon in front of him. Plaintiff testified that when he saw the weapon, he "drew [his] arms back to [him]self out of just an involuntary reaction[,]" letting go of the door and, although plaintiff did not recall pushing the door open, he did recall releasing "the door in a rather hasty motion." Though plaintiff maintains that it was his intention to reveal to the officers his presence in the closet, he said nothing.

Van Pelt testified that he was holding his weapon in his right hand and was reaching for the closet door with his left when, according to both Van Pelt and Wilson, either plaintiff or the door, as it swung open, made contact with Van Pelt, causing him to fall backwards and his weapon to discharge. It was plaintiff's testimony that he was holding the closet door closed while he was seated on a box at least several inches from the floor. Wilson testified that following the shooting,

he observed plaintiff in the closet, in the sitting position and the defendants' expert, Gerald Styers, a former Pennsylvania State Policeman, opined that, based upon the path of the bullet as described to him, as well as the location of the entry of the bullet through the door and in plaintiff's body, plaintiff was in some kind of sitting position when he was shot. The bullet from Van Pelt's weapon travelled through the door, entering plaintiff's left thigh to his upper buttocks where it remains lodged near his spine. The officers immediately called for a rescue squad.[1]

An investigation was subsequently conducted by Sergeant Marshall Parker of the Marion County Sheriff's Department. Though, strangely, plaintiff was not interviewed as part of the inquiry, Wilson gave a statement about the incident to Sgt. Parker while Van Pelt was interviewed by Chief Deputy C.L. Phillips. Plaintiff maintains that the two statements were suspiciously similar in both sentence construction and content.[2]

---

1. Plaintiff testified that he was unable to work for one week following the shooting and that he was on light duty for three weeks after that. Though he is employed, he testified that he still experiences some pain, which is, at times, severe.

2. The following is an excerpt from Wilson's statement:

> We approached the residence, Mr. Mallamo's vehicle was in the driveway with the keys in the ignition. I ran the registration and it came back to the painting co. that I think Mr. Mallamo works for. I have seen Mr. Mallamo driving the vehicle on several occasions. The lights were on in the living room. I knocked on the door but Mr. Mallamo did not answer the door. The front door was unlocked and not completely closed. Deputy Van Pelt said he heard a noise. And a male voice. A deep voice. Deputy Van Pelt then went out to the cruiser and talked with Sgt. Wolford who felt we had probable cause to enter the residence. Myself and Deputy Van Pelt searched the up stairs and found a rifle (uncased) in the bedroom (south end). At that time Deputy Van Pelt [illegible] his weapon, and we continued to search in the basement. The basement was unlighted except for a small window to the front side of the house (basement). We searched the basement and found a closet with the door slightly open, Deputy Van Pelt went over to the door and started to reach for the knob when the door flew open and someone was in the doorway. The door or the suspect hit Deputy Van Pelt causing him to trip over something backwards at which time his weap-

on discharged and I heard Mr. Mallamo say I'm shot. I helped Mr. Mallamo out of the closet and Deputy Van Pelt called Central for the rescue squad.

In comparison, the statement Van Pelt gave to Chief Deputy Phillips read, in part:

> We approached the residence, Mallamo's car was parked in the driveway with the keys in it. Al Wilson had run the registration and it came back to the painting company that Wilson stated Mallamo worked for. The lights in the upstairs of the residence were on, the front door was unlocked and ajar (partly open). I could hear a noise, and a male voice (deep). I went back to the radio and Sergeant Wolford felt there was probable cause to enter the residence. Wilson and myself searched the upstairs of the residence in one of the upstairs bedroom leaning was an uncased rifle, after spotting said weapon I removed my Ruger sidearm from my leather. We continued to search the residence for Edward Mallamo. After completing the search of the upstairs, we went to the basement. The basement was unlighted except for a small window to the front of the house which was partly opened. Officer Wilson stood [b]y the couch as I walked through several bags of garbage, and the side of the couch. I then spotted a door on the left hand side of the wall, near the rear of the residence. The door was partly obstructed by a box, a wood stove, and several other items. As I came to the door, the door exploded open. The subject behind the door pushed it open with his left hand and arm, he was lunging

Sgt. Parker's investigation report indicated, *inter alia,* that, upon his request, a search warrant for plaintiff's home had been issued when an inspection of the house immediately following the incident revealed not only the rifle Van Pelt and Wilson had initially observed in the upstairs bedroom, but also a sawed-off shotgun laying next to a bed. Inside the closet where plaintiff had been hiding was what was described as a "homemade billy club," an ax handle that had been cut off and wrapped in black tape. Upon execution of the search warrant, officers also seized, among other things, a pellet rifle.

A summary of Sgt. Parker's report included findings that Wilson and Van Pelt were at plaintiff's home "in a just and lawful manner ... to serve a circuit court capias." Sgt. Parker further found that the officers had reason to believe that plaintiff was in his home and "refused to surrender himself to arresting officers[;]" that he "resisted and obstructed officers in [their] performance of [their] duty in serving the circuit court capias[;]" that the officers had "reason and good cause to believe his life and his partner['s] life may be put in [jeopardy] by the finding of deadly weapons in the home and the fact [plaintiff] was hiding within the home from officers, in a darken[ed] room within his home, knowing officers were there with warrant[;]" and that the officers "had just cause to pull [their] weapons to the ready, to aid in [their] defense of themselves, to insure

[their] safety." Sgt. Parker found significant "the fact that [plaintiff] could see the officers from his hiding place behind a closed door[,]" and that plaintiff had obstructed the officers in their lawful attempt to arrest him. Finally, Sgt. Parker indicated his belief that Van Pelt "acted in a lawful manner in the exercise of his duty."

Plaintiff subsequently filed a complaint in the United States District Court for the Northern District of West Virginia alleging civil rights violations pursuant to 42 U.S.C. § 1983.[3] The defendants in that action were Van Pelt, Wilson, the Marion County Commission, Marion County Sheriff Junior Slaughter and the Town of Rivesville. The defendants' motion for summary judgment was granted and all of plaintiff's federal claims were dismissed with prejudice. The remaining state pendent claims were likewise dismissed, but without prejudice.

Accordingly, on June 2, 1994, plaintiff filed the present action[4] against the above-named defendants in the Circuit Court of Marion County, alleging negligent training and supervision, common law conspiracy, negligence and breach of statutory duty to provide medical services.

On July 21, 1994, the defendants filed a joint motion to dismiss plaintiff's complaint pursuant to Rule 12(b)(6) of the West Virginia Rules of Civil Procedure,[5] asserting that

---

towards me. I could not see what was in his right hand. I stepped backwards to the right in an attempt to avoid the door. I'm not sure if the door hit me, or Mallamo hit me, or if I tripped over something (possibly the ledge to the wood stove), or a combination of these things. My weapon accidently [sic] discharged as I fell to the floor, injuring my right ankle. The attacker, now known to me to be Mallamo; step[ped] back into the closet. Mallamo said, I'am [sic] shot. Al helped the defendant to his feet, into a clear space in the room. I then called communications for the rescue squad.

3. Plaintiff alleged use of excessive force by the officers in his arrest; failure to adequately train and supervise the officers; and conspiracy. The court found that plaintiff's excessive force claim failed because the officers' use of force in arresting plaintiff was not objectively unreasonable in that the discharge of Van Pelt's weapon was purely accidental. Moreover, the court determined that, contrary to plaintiff's allegations, the officers did not act unreasonably in drawing

their weapons in the first place, considering they observed a high-powered rifle in the house and were searching a dark basement.

4. According to the parties, the discovery which was conducted in the federal action was incorporated into the state action by agreed order of October 21, 1994.

5. *W. Va. R. Civ. P.* 12(b)(6) provides:

(b) *How presented.*—Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: ... (6) failure to state a claim upon which relief can be granted.... If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by

the individual defendants, Van Pelt, Wilson and Slaughter, were immune from liability under *W. Va. Code*, 29–12A–5(b) [1986] and that the Marion County Commission and the Town of Rivesville were likewise immune under *W. Va.Code*, 29–12A–5(a)(3) and (5) [1986]. By order dated October 21, 1994, Van Pelt and Wilson were dismissed from this action and by order dated December 6, 1994, the Town of Rivesville was also dismissed. The trial court refused to dismiss the action against Slaughter and the Marion County Commission and they remained parties to this action until they entered into a settlement agreement with plaintiff which was approved by the trial court on February 15, 1995.

It is from the October 21, 1994 order dismissing Wilson and the December 6, 1994 order dismissing the Town of Rivesville which plaintiff now appeals.

## II.

■ Though the original defendants in this action filed a joint motion to dismiss pursuant to *W. Va. R. Civ. P.* 12(b)(6),[6] the parties acknowledge that the trial court considered more than the pleadings in its orders of dismissal. Thus, "the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56[.]" *W. Va. R. Civ. P.* 12(b)(6); *Chapman v. Kane Transfer Co., Inc.*, 160 W.Va. 530, 536, 236 S.E.2d 207, 211 (1977) ("The Rules permit a motion under Rule 12(b)(6) ... to be treated and considered as a motion for summary judgment along with matters outside the pleadings[.]"). *See State v. Chase Securities, Inc.*, 188 W.Va. 356, 365 n. 30, 424 S.E.2d 591, 600 n. 30 (1992); 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1366 (1990). Accordingly, our review of the trial court's orders of October 21, 1994 and December 6, 1994 is *de novo.* Syl. pt. 1, *Hose v. Berkeley County Planning Commission,* 194 W.Va. 515, 460 S.E.2d 761 (1995) (" 'A circuit court's entry of summary judgment is reviewed *de novo.*'

Syl. pt. 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994).")

## III.

This appeal involves a claim for injury against a political subdivision of the State of West Virginia and one of its employees, thereby invoking the Governmental Tort Claims and Insurance Reform Act, *W. Va. Code*, 29–12A–1, *et seq.* *See Hose, supra; Beckley v. Crabtree*, 189 W.Va. 94, 428 S.E.2d 317 (1993); *Randall v. Fairmont City Police Dept.,* 186 W.Va. 336, 412 S.E.2d 737 (1991). It is undisputed that the Town of Rivesville is a political subdivision within the meaning of *W. Va. Code*, 29–12A–3(b) and (c) [1986] and that Wilson, at all times relevant to this case, was an employee thereof, within the meaning of *W. Va. Code*, 29–12A–3(a) [1986].

### A.

In syllabus point 1 of *Beckley, supra,* this Court set forth the three statutory exceptions to an employee's immunity from personal tort liability:

West Virginia Code § 29–12A–5(b) provides that employees of political subdivisions are immune from personal tort liability unless '(1) [h]is or her acts or omissions were manifestly outside the scope of employment or official responsibilities; (2) [h]is or her acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or (3) [l]iability is expressly imposed upon the employee by a provision of this code.'

It is plaintiff's contention that Wilson, an employee of the Town of Rivesville, is not immune from personal tort liability in this case. Rather, plaintiff argues that Wilson's conduct falls under *W. Va. Code*, 29–12A–5(b)(1) and (2), two of the aforementioned exceptions to such immunity.

■ Plaintiff first maintains that Wilson is not immune from personal tort liability in this case because he acted manifestly outside

---

the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

**6.** *See* n. 5, *supra.*

the scope of his employment or official responsibilities when he attempted to serve the capias on plaintiff at his home in the City of Fairmont, as Fairmont is beyond the corporate limits of Wilson's employer, the Town of Rivesville. *W. Va. Code*, 29–12A–5(b)(1) [1986]. Wilson argues otherwise, as *W. Va. Code*, 8–14–3 [1976] [7] confers upon him the authority to execute the capias anywhere within Marion County, "the county ... in which the municipality [of the Town of Rivesville] is located[.]" *W. Va. Code*, 8–14–3 [1976] provides, in relevant part:

> *The chief* and any member of the police force or department *of a municipality* and any municipal sergeant *shall have all of the powers, authority, rights and privileges within the corporate limits of the municipality with regard to the arrest of persons*, the collection of claims, and the execution *and return of any* search warrant, *warrant of arrest or other process, which can legally be exercised or discharged by a deputy sheriff of a county.* In order to arrest for the violation of municipal ordinances and *as to all matters arising within the corporate limits and coming within the scope of his official duties, the powers of any chief,* policeman or sergeant *shall extend anywhere within the county or counties in which the municipality is located, and any such chief,* policeman or sergeant *shall have the same authority of pursuit and arrest beyond his normal jurisdiction as has a sheriff.*

(emphasis added).

■ Our review of *W. Va. Code*, 8–14–3 [1976] is governed by the principle of statutory analysis that " ' "[w]here the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation." Syllabus Point 2[,] *State v. Elder,* 152 W.Va. 571, 165 S.E.2d 108 (1968).' Syl. pt. 1, *Peyton v. City Council of Lewisburg,* 182 W.Va. 297, 387 S.E.2d 532 (1989)." Syl. pt. 3, *Hose, supra.* The pivotal statutory language provides that Wilson's power "as to all matters arising within the corporate limits ... shall extend anywhere within the county ... in which the municipality is located[.]" The

matter which arose within the corporate limits of the Town of Rivesville was plaintiff's initial arrest for driving on a suspended license. When plaintiff subsequently failed to appear at his scheduled circuit court appeal, a capias was issued by the Circuit Court of Marion County. Wilson acted pursuant to *W. Va. Code*, 8–14–3 [1976] and within the scope of his employment and official responsibilities when he served the capias on plaintiff outside the corporate boundaries of the Town of Rivesville but within Marion County.

■ Additionally, plaintiff argues that Wilson is not immune from personal tort liability in this case because he acted outside the scope of his employment and official responsibilities when he and Van Pelt entered plaintiff's home against the advice of the prosecuting attorney. *W. Va. Code*, 29–12A–5(b)(1) [1986]. As previously indicated, when plaintiff failed to answer the officers' repeated knocks on the front door of his home, Van Pelt contacted the sheriff's department dispatcher from inside his cruiser, seeking advice from the prosecuting attorney's office. Van Pelt testified that the prosecutor on-call advised the officers not to enter the home, but to either wait for plaintiff to come out or to obtain a search warrant. It was Wilson's testimony that, although he did not hear the prosecutor's admonition against entering the home, he did hear Sgt. Wolford's subsequent advice that they could enter the home because they had a capias and reason to believe plaintiff was inside.

Though plaintiff questions the veracity of Wilson's testimony that he did not hear the prosecutor's admonition against entering his home, plaintiff has offered no evidence in this regard. What the evidence does reveal is that the prosecutor's advice was communicated over the radio directly to Van Pelt, not to Wilson, and that Wilson heard Sgt. Wolford's subsequent directive to enter the home. The evidence further reveals that Wilson had a valid capias for plaintiff's arrest for failure to appear and that the officers had reason to believe plaintiff was inside his home. The United States Supreme Court has expressly stated that, "an arrest warrant founded on

---

7. *W. Va. Code*, 8–14–3 was amended in 1990. However, the changes do not affect this appeal.

probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639, 661 (1980). We find, therefore, that Wilson did not act outside the scope of his employment or official responsibilities when he entered plaintiff's home in an attempt to serve the capias. *W. Va. Code*, 29–12A–5(b)(1) [1986].

### B.

■ Plaintiff's final argument is essentially that Wilson conspired to conceal the truth and/or to distort the facts surrounding the shooting and that such conduct was outside the scope of his employment and official responsibilities, *W. Va. Code*, 29–12A–5(b)(1) [1986], and was with malicious purpose and in bad faith. *W. Va. Code*, 29–12A–5(b)(2) [1986]. Plaintiff argues, therefore, that Wilson is not immune from liability for conspiracy. We agree.

Plaintiff contends that, although Wilson and Van Pelt gave statements separately, and to two different investigating officers, their descriptions of the incident were suspiciously similar in content and sentence construction. *See* n. 2, *supra.* According to plaintiff, the officers' statements are proof of the attempt by all of the original defendants in this case to distort and conceal the facts of the shooting. As further evidence of a cover-up, plaintiff maintains that the officers falsely portrayed him as the aggressor, despite the physical evidence to the contrary. Specifically, Wilson told the investigating officer that "the door [of the closet door where plaintiff was hiding] flew open and someone was in the doorway[,]" while Van Pelt stated that "[t]he subject behind the door pushed it open with his left hand and arm, he was lunging towards me." *See* n. 2, *supra.* Defendants' expert, Gerald Styers, indicated, however, that, based upon the path of the bullet as described to him, and the location of the entry of the bullet through the door and in plaintiff's body, plaintiff was in some kind of sitting position when he was shot.

■ As this Court previously held in syllabus points 1 and 2 of *Williams v. Preci-*

*sion Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329 (1995),

1. ' "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).' Syllabus Point 1, *Andrick v. Town of Buckhannon*, 187 W.Va. 706, 421 S.E.2d 247 (1992).

2. Summary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.

Whether Wilson attempted to distort or conceal the facts surrounding the shooting and whether such actions, if proven, were outside the scope of his employment and official responsibilities, *W. Va. Code*, 29–12A–5(b)(1) [1986], or were with malicious purpose and in bad faith, *W. Va. Code*, 29–12A–5(b)(2) [1986], are factual questions not properly resolved on summary judgment. *See Williams*, 194 W.Va. at 59, 459 S.E.2d at 336 ("[T]his Court will reverse summary judgment if we find, after reviewing the entire record, a genuine issue of material fact exists or if the moving party is not entitled to judgment as a matter of law.")

### IV.

### A.

The remaining issue for our review is whether the Town of Rivesville was entitled to immunity under *W. Va. Code*, 29–12A–5(a)(3) [1986], one of seventeen instances specified by the West Virginia legislature in which political subdivisions would have immunity from tort liability. *O'Dell v. Town of Gauley Bridge*, 188 W.Va. 596, 600, 425 S.E.2d 551, 555 (1992). *See Hose*, 194 W.Va. at 520, 460 S.E.2d at 766. *W. Va. Code*, 29–12A–5(a)(3) [1986] provides that "[a] political

subdivision is immune from liability if a loss or claim results from: ... Execution or enforcement of the lawful orders of any court[.]"

It appears that it is plaintiff's position that the officers were negligent in the execution of the capias and, are, therefore, not immune from liability under *W. Va. Code*, 29–12A–5(a)(3) [1986]. Instead, plaintiff apparently argues [8] that the Town of Rivesville is liable in damages for his injuries from the discharge of Van Pelt's weapon under *W. Va. Code*, 29–12A–4(c)(2) [1986], which provides:

(c) *Subject to sections five and six* [§§ *29–12A–5* and 29–12A–6] of this article, a political subdivision is liable in damages in a civil action for injury, death, or loss to persons or property allegedly caused by an act or omission of the political subdivision or of any of its employees in connection with a governmental or proprietary function, as follows:

. . . .

(2) Political subdivisions are liable for injury, death, or loss to persons or property caused by the *negligent performance of acts by their employees while acting within the scope of employment.*

(emphasis added). We disagree. *W. Va. Code*, 29–12A–4(c)(2) [1986], quoted above, is clear and unambiguous and, thus, its plain meaning " ' "is to be accepted without resorting to the rules of interpretation." ' " Syl. pt. 3, *Hose, supra.* Accordingly, we find that *W. Va. Code*, 29–12A–4(c)(2) [1986] is not applicable to the case before us.

■ The plain meaning of *W. Va. Code*, 29–12A–4(c)(2) [1986] expressly provides that the liability of a political subdivision for injury to persons allegedly caused by the negligent performance of acts by their employees is " '[s]ubject to sections five and six [§§ 29–12A–5, entitled "Immunities from Liability," and 29–12A–6, entitled "Limitation of actions; specification of amount of damages not allowed"] of this article.' " *Hose*, 194 W.Va. at 521, 460 S.E.2d at 767 (emphasis provided). As we have already indicated, Wilson and Van Pelt were in the course of executing a

valid capias when Van Pelt's weapon discharged, resulting in plaintiff's injury. *See W. Va. Code*, 29–12A–5(a)(3) [1986]. Thus, pursuant to *W. Va. Code*, 29–12A–4(c)(2) [1986] and *W. Va. Code*, 29–12A–5(a)(3) [1986], a political subdivision is immune from liability if a loss or claim results from the execution or enforcement of the lawful orders of any court regardless of whether such loss or claim is caused by the negligent performance of acts by the political subdivision's employees while acting within the scope of employment.

**B.**

As previously discussed, plaintiff maintains that Wilson conspired to conceal the truth and/or to distort the facts surrounding the shooting. It is plaintiff's contention that such conduct in no way relates to the execution of the capias and that the Town of Rivesville is not immune from liability therefor, under *W. Va. Code*, 29–12A–5(a)(3) [1986].

■ We agree that Wilson's attempt to conceal or distort the facts concerning the shooting incident, if proven, is clearly not related to the execution of the capias on plaintiff. However, even if plaintiff were able to establish that Wilson participated in a conspiracy to cover up the shooting incident, a plain reading of *W. Va. Code*, 29–12A–4(c)(2) [1986] would, nevertheless, not impose liability on the Town of Rivesville. *See* syl. pt. 3, *Hose, supra. W. Va. Code*, 29–12A–4(c)(2) [1986] provides that political subdivisions are liable for injury or loss to persons "caused by the *negligent* performance of acts by their employees while acting within the scope of employment." (emphasis added). In that conspiracy is an intentional act, not a negligent one, the Town of Rivesville would not be liable for any intentional malfeasance on the part of Wilson. *See Dixon v. American Industrial Leasing Co.*, 162 W.Va. 832, 834, 253 S.E.2d 150, 152 (1979) ("[A] civil conspiracy is a combination of two or more persons by *concerted* action to accomplish an

---

8. Plaintiff presents in his brief a mere four-sentence argument that the Town of Rivesville is not immune under *W.Va.Code*, 29–12A–5(a)(3)

[1986], the content of which offered little substance.

unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means." (*citing* 15A C.J.S. *Conspiracy* § 1(1)) (emphasis added)). The Town of Rivesville is, therefore, immune from liability.

### C.

██ Plaintiff also argues that the Town of Rivesville is not immune from liability for his injuries resulting from the discharge of Van Pelt's weapon under *W. Va. Code*, 29–12A–5(a)(5) [1986], which provides, in relevant part: "A political subdivision is immune from liability if a loss or claim results from: ... the method of providing, police, law enforcement or fire protection[.]" This Court has already concluded that the Town of Rivesville is immune from liability for plaintiff's injuries pursuant to *W. Va. Code*, 29–12A–5(a)(3) [1986], in that Wilson and Van Pelt were in the process of executing a lawful court order when Van Pelt's weapon discharged. Thus, plaintiff's argument that the Town of Rivesville is not immune for his injuries under *W. Va. Code*, 29–12A–5(a)(5) [1986] must necessarily fail. However, we take this opportunity to discuss the meaning of the phrase "the method of providing police, law enforcement or fire protection[,]" in an effort to facilitate resolution of future litigation in this area.

In syllabus points three and four of *Beckley v. Crabtree*, 189 W.Va. 94, 428 S.E.2d 317 (1993), this Court held:

> 3. The phrase 'method of providing police, law enforcement or fire protection' contained in W.Va. Code, § 29–12A–5(a)(5) refers to the formulation and implementation of policy related to how police, law

enforcement or fire protection is to be provided.

> 4. Resolution of the issue of whether a loss or claim occurs as a result of 'the method of providing police, law enforcement or fire protection' requires determining whether the allegedly negligent act resulted from the manner in which a formulated policy regarding such protection was implemented.

In *Beckley*, a county sheriff, after arresting a suspect and placing him in the back seat of a car, was attempting to return a shotgun to the trunk of the car when it discharged, injuring plaintiff, a state trooper. This Court determined that "[t]he methods employed by the law enforcement officers who detained and arrested the suspect were complete before the gun discharged. [The sheriff] was simply returning a shotgun to the trunk of the car when the accident occurred. Although this incidental action occurred within the scope of employment, it was not so closely related or necessary to effectuating the arrest as to be considered a component of 'the method of providing law enforcement protection.'" *Id.* at 98, 428 S.E.2d at 321.[9]

In *Jackson v. City of Kansas City*, 235 Kan. 278, 680 P.2d 877 (1984), two city-owned firetrucks, dispatched to the same fire from different firestations, collided, causing injuries to plaintiffs, several firemen. The Supreme Court of Kansas rejected the city's claim that, because the accident occurred while two of its fire trucks were responding to a fire alarm, it was immune from liability. *Id.* 680 P.2d at 889. Rather, the court concluded that the applicable statute, which

---

9. In reaching our conclusion in *Beckley*, we relied primarily on the case of *State v. Terrell*, 588 S.W.2d 784 (1979), wherein the Supreme Court of Texas concluded that the legislature " 'intended to exclude from the [Texas Tort Claims] Act only those acts or omissions which constitute the execution of or the actual making of those policy decisions.... if the negligence causing an injury lies in the formulating of policy—i.e., the determining of the *method* of police protection to provide—the government remains immune from liability. If, however, an officer or employee acts negligently in carrying out that policy, government liability may exist under the Act.' " *Beckley*, 189 W.Va. at 98, 428 S.E.2d at 321 (*quoting*

*Terrell*, 588 S.W.2d at 788). Accordingly, the *Terrell* court held that the state's policy of setting a maximum speed and detecting violators by the use of radar-equipped patrol cars was a policy formulation decision for which the city could not be held liable under the applicable Texas statute which, like *W. Va. Code*, 29–12A–5(a)(5) [1986], provides immunity for injuries caused by the method of providing police or fire protection. However, it was the implementation and not the formulation of policy where a highway patrolman collided with another vehicle while attempting to cross a highway to apprehend a speeder. Thus, the city was not immune from liability.

grants immunity for injury resulting from "the method of providing police or fire protection,"

> is aimed at such basic matters as the type and number of fire trucks and police cars considered necessary for the operation of the respective departments; how many personnel might be required; how many and where police patrol cars are to operate; the placement and supply of fire hydrants; and the selection of equipment options. Accordingly, a city is immunized from such claims as a burglary could have been prevented if additional police cars had been on patrol, or a house could have been saved if more or better fire equipment had been purchased. We do not believe [the applicable statute] is so broad as to immunize a city on every aspect of negligent police and fire department operations. Should firemen negligently go to the wrong house and chop a hole in the roof thereof, we do not believe the city has immunity therefor on the basis the negligent act was a part of the method of fire protection.

*Id.* 680 P.2d at 890. *See Forbus v. City of Denton,* 595 S.W.2d 621, 623 (Tex.Civ.App. 1980) (Deciding whether to provide mattress to inmates was policy formulation for which governmental entity would be immune; however, the decision as to what particular type of mattress to provide was policy implementation and was not exempt from claim of negligence.)

We find the above discussion to be instructive. In the case before us, the evidence reveals that the officers acted pursuant to formulated policy when they unholstered their weapons upon observing a high-powered rifle in a bedroom of plaintiff's home. However, the discharge of Van Pelt's weapon was not the result of implementing such policy. Thus, because the injuries plaintiff sustained were not the result of the method of providing police, law enforcement or fire protection, within the meaning of *W. Va. Code,* 29–12A–5(a)(5) [1986], the Town of Rivesville would not have been immune from liability thereunder. Consequently, under *W. Va. Code,* 29–12A–4(c)(2) [1986], *supra,* the Town

of Rivesville would have been liable for the negligence, if any, of its employee, Wilson.

## V.

For the reasons discussed above, the circuit court's October 21, 1994 order dismissing Police Chief Wilson is reversed and this case is remanded on the issue of whether Wilson conspired to conceal and/or distort the facts surrounding the shooting incident. The December 6, 1994 order dismissing the Town of Rivesville is hereby affirmed.

Affirmed, in part; reversed, in part, and remanded.