587 S.E.2d 122

STATE of West Virginia ex rel. WEIR-TON MEDICAL CENTER and Lawrence Callahan, M.D., Petitioners

v.

Honorable James P. MAZZONE, Judge of the Circuit Court of Brooke County, and Rebecca Vilga, Executor and Fiduciary of the Estate of Paul A. Vilga, Jr., Respondents.

No. 30360.

Supreme Court of Appeals of West Virginia.

Submitted April 23, 2002.

Decided June 19, 2002.

Richard W. Stuhr, Dino S. Colombo, Colombo & Stuhr, PLLC, Morgantown, for Petitioners.

Frank Cuomo, Jason A. Cuomo, Cuomo & Cuomo, Wellsburg, for Respondent Vilga.

MAYNARD, Justice.

This case is before this Court upon a petition for a writ of prohibition filed by the Weirton Medical Center and Lawrence Callahan, M.D. (hereinafter "petitioners"), against the Honorable James Mazzone, Judge of the Circuit Court of Brooke County, and Rebecca Vilga, executor and fiduciary of the estate of Paul A. Vilga, Jr., deceased. The petitioners seek to prohibit the enforcement of evidentiary rulings issued by Judge Mazzone in December 2001 in the underlying wrongful death, medical malpractice action. This Court has before it the petition for a writ of prohibition, the response thereto, and argument of counsel. For the reasons set forth below, the writ is granted as moulded.

## I. FACTS

On March 13, 2000, around 3:00 p.m., Paul Vilga was transported by ambulance to the Weirton Medical Center with complaints of

abdominal pain and a possible seizure following a tooth extraction. Upon arrival at the hospital, Mr. Vilga was treated by Dr. Lawrence Callahan who made a diagnosis of malignant hyperthermia.[1] After being informed by the hospital pharmacy that Dantrolene, the drug used to treat malignant hyperthermia, was not available, Dr. Callahan arranged for Mr. Vilga to be transported by helicopter to Allegheny General Hospital in Pittsburgh, Pennsylvania.[2]

Upon arrival at Allegheny General Hospital, Mr. Vilga was treated by Dr. Bryan Veynovich, who concluded that malignant hyperthermia was not the proper diagnosis. Dr. Veynovich believed that Mr. Vilga was suffering from sepsis, a bacterial infection of the blood, and began administering treatment for that condition. Nonetheless, Mr. Vilga died on March 14, 2000 at 12:05 a.m.[3]

On March 15, 2001, Rebecca Vilga, the executor and fiduciary of Mr. Vilga's estate, filed suit against Weirton Medical Center and Dr. Callahan in the Circuit Court of Brooke County. On May 11, 2001, the circuit court held a scheduling conference and set a deadline of October 1, 2001 for expert identification and a trial date of February 25, 2002. On November 1, 2001, pursuant to a joint agreement to extend the original expert identification deadline, the parties identified their expert witnesses. Among the witnesses identified by the petitioners was Dr. Gerard Nuovo, a board certified pathologist. The petitioners stated, "Dr. Nuovo is an expert in the field of pathology. Based upon a review of the pertinent pathology slides, it is anticipated that Dr. Nuovo will testify that Mr. Vilga did not suffer from Sepsis in March 2000."

On November 8, 2001, Ms. Vilga filed a motion to strike and limit the petitioners' experts arguing that the number of experts identified was excessive and that the witnesses would provide overlapping and cumulative testimony. The petitioners had identified ten expert witnesses. The circuit court granted Ms. Vilga's motion and ordered that all parties would be limited to one expert per field of expertise. Accordingly, the court stated that if Dr. Callahan was going to testify on his own behalf as an expert in emergency medicine, then he would not be permitted to present testimony from an independently-retained expert in that field of expertise.

In response to these rulings, the petitioners filed an amended disclosure of witnesses on November 16, 2001, reducing their number of expert witnesses to five. Approximately three weeks later, the petitioners filed a second amended disclosure of witnesses providing information about additional opinion testimony to be elicited from Dr. Nuovo regarding the cause of Mr. Vilga's death. The petitioners stated that Dr. Nuovo was expected to testify that the decedent suffered from rotavirus and that it was the direct and proximate cause of his death. In response, Ms. Vilga filed a motion to strike the second amended disclosure of expert witnesses. Thereafter, the petitioners filed a request for a mandatory status conference pursuant to W.Va.Code § 55–7B–6 (1986), in order "to determine whether expert witnesses are necessary." The petitioners argued that because this hearing had not been held, their disclosure regarding Dr. Nuovo's opinion as to the cause of Mr. Vilga's death was timely.

After hearing oral argument on the matter, the circuit court granted Ms. Vilga's motion to strike on December 19, 2001, ruling that the petitioners would not be permitted to introduce Dr. Nuovo's cause of death opinion because it was untimely disclosed.[4]

1. Malignant hyperthermia is "an inherited disorder marked by often fatal high body temperature, with rigid muscles occurring in affected patients exposed to certain anesthetic drugs." *The Mosby Medical Encyclopedia* 483 (revised ed.1992).

2. Ms. Vilga maintains that Dantrolene was available in the operating room of Weirton Medical Center.

3. Blood cultures drawn prior to Mr. Vilga's death were negative for bacteria in his blood and an autopsy revealed no evidence of sepsis. The autopsy report indicates the cause of death was "respiratory failure, secondary to pulmonary intra-alveolar hemorrhage."

4. On December 21, 2000, counsel for Rebecca Vilga took the deposition of Dr. Nuovo. According to the petitioners, the focus of the deposition

The trial court further ruled that a pre-trial conference as set forth in W.Va.Code § 55–7B–6 was not mandatory and that the petitioners had waived their right to such a conference.

Following these rulings, the petitioners filed this petition for writ of prohibition seeking to prohibit Judge Mazzone from enforcing his evidentiary orders and to thereby allow petitioners to present Dr. Nuovo's cause of death opinion at trial as well as the expert testimony of both Dr. Callahan and the petitioners' independently-retained emergency medicine expert.

## II. STANDARD FOR ISSUANCE OF A WRIT OF PROHIBITION

■ This Court has held that "[p]rohibition lies only to restrain inferior courts from proceeding in causes over which they have no jurisdiction, or, in which, having jurisdiction, they are exceeding their legitimate powers and may not be used as a substitute for [a petition for appeal] or certiorari." Syllabus Point 1, *Crawford v. Taylor*, 138 W.Va. 207, 75 S.E.2d 370 (1953).

> In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear

error as a matter of law, should be given substantial weight.

Syllabus Point 4, *State ex rel. Hoover v. Berger*, 199 W.Va. 12, 483 S.E.2d 12 (1996). With these standards in mind, we now address the issues in this case.

## III. DISCUSSION

### A. The Ruling Limiting Dr. Nuovo's Testimony

The petitioners contend that the circuit court erred by ruling that Dr. Nuovo would not be permitted to testify that Mr. Vilga died as the result of rotavirus. The petitioners claim that any concern the court had regarding prejudice to Ms. Vilga was unfounded because Dr. Nuovo was timely disclosed as an expert witness pursuant to the parties agreement extending the deadline for expert witness disclosure to November 1, 2001.

■ In addition, the petitioners argue that their disclosure regarding Dr. Nuovo's expected testimony as to Mr. Vilga's cause of death cannot be considered untimely because the circuit court never held the mandatory status conference required by W.Va.Code § 55–7B–6. Based on this Court's recent decision in *Daniel v. Charleston Area Medical Center, Inc.*, 209 W.Va. 203, 544 S.E.2d 905 (2001), the petitioners argue that the circuit court had no authority to enforce the order from the original scheduling conference and refuse to hold the mandatory status conference required by W.Va.Code § 55–7B–6. Although the parties complied with the court's original scheduling order, the petitioners assert that *Daniel* requires the court to hold the mandatory status conference required by W.Va.Code § 55–7B–6. Since the purpose of the mandatory status conference is to determine whether expert witnesses are necessary and to allow the parties a reasonable amount of time thereafter to identify such experts, the petitioners claim that their last disclosure with respect to Dr. Nuovo's testimony was timely.

■ Pursuant to Rule 16(b) of the West Virginia Rules of Civil Procedure, a trial

was Dr. Nuovo's testing and his opinion that Mr. Vilga's death was caused by rotavirus.

court has the discretion to enter a scheduling order in any action, limiting the time that parties have, *inter alia,* to amend the pleadings, file motions, and complete discovery.[5] Ordinarily, the scheduling order entered by a trial court pursuant to Rule 16 controls the course of litigation of a case unless modified by a subsequent order. *State ex rel. Crafton v. Burnside,* 207 W.Va. 74, 78, 528 S.E.2d 768, 772 (2000). However, in *Daniel,* this Court acknowledged that with respect to the identification of expert witnesses in medical malpractice cases, the provisions of W.Va. Code § 55–7B–6 take precedence over a Rule 16 scheduling order. W.Va.Code § 55–7B–6 provides, in pertinent part:

(a) In each medical professional liability action against a health care provider, not less than nine nor more than twelve months following the filing of answer by all defendants, a mandatory status conference shall be held at which, in addition to any matters otherwise required, the parties shall:

. . . .

(2) On behalf of the plaintiff, certify to the court that either an expert witness has or will be retained to testify on behalf of the plaintiff as to the applicable standard of care or that under the alleged facts of the action, no expert witness will be required. If the court determines that expert testimony will be required, the court shall provide a reasonable period of time for obtaining an expert witness and the action shall not be scheduled for trial, unless the defendant agrees otherwise, until such period has concluded. It shall be the duty of the defendant to schedule such conference with the court upon proper notice to the plaintiff.

In *Daniel,* the plaintiff appealed a decision of the circuit court granting summary judg-

ment to the defendant hospital after the court determined that expert testimony was required and that the plaintiff had failed to secure an expert within the time frame allotted by the court's scheduling order. Upon review, we determined that W.Va.Code § 55–7B–6 required the circuit court to hold a status conference to determine whether expert testimony was necessary and if so, provide a reasonable time for the plaintiff to obtain an expert witness. This Court stated,

Because this case has been determined to fall within the parameters of the Medical [Professional] Liability Act, the provisions of the Act necessarily control our decision in this case. In section six, which governs the issue of expert retention, the Medical [Professional] Liability Act contemplates that the issue of experts will be resolved during a mandatory status conference in requiring the plaintiff to "certify to the court that either an expert witness has or will be retained to testify ... as to the applicable standard of care or that under the alleged facts of the action, no expert witness will be required." W.Va.Code § 55–7B–6(a)(2). The final determination regarding the need for an expert witness, as the Act makes clear, is a matter for the trial court: *"If the court determines that expert testimony will be required,* the court shall provide a reasonable period of time for obtaining an expert witness[.]" *Id.* (emphasis supplied).

*Daniel,* 209 W.Va. at 206, 544 S.E.2d at 908 (footnote omitted). Accordingly, we concluded in *Daniel* that the circuit court had prematurely granted summary judgment.

▪ In the case *sub judice,* the circuit court determined that our decision in *Daniel* was not applicable. In that respect, the circuit court concluded that W.Va.Code § 55–

**5.** Rule 16(b) of the West Virginia Rules of Civil Procedure provides:

*Scheduling and planning.*—Except in categories of actions exempted by the Supreme Court of Appeals, the judge shall, after consulting with the attorneys for the parties and any unrepresented parties, by a scheduling conference, telephone, mail or other suitable means, enter a scheduling order that limits the time:
(1) To join other parties and to amend the pleadings;
(2) To file and hear motions; and
(3) To complete discovery.
The scheduling order also may include:
(4) The date or dates for conferences before trial, a final pretrial conference, and trial; and
(5) Any other matters appropriate in the circumstances of the case.
A schedule shall not be modified except by leave of the judge.

**152**

7B–6 does not apply to defense experts and that by complying with the circuit court's Rule 16 scheduling order, the parties waived the W.Va.Code § 55–7B–6 status conference. The circuit court reasoned that because W.Va.Code § 55–7B–6 only addresses the plaintiff's need for an expert witness, the defendant cannot delay the disclosure of his or her expert witnesses when there has been a disclosure of expert witnesses by the plaintiff pursuant to the court's Rule 16 scheduling order.

■ Although all the parties in this case disclosed their expert witnesses in accordance with the circuit court's Rule 16 order, as modified by their own agreement, we nevertheless believe that the circuit court was required to hold the status conference mandated by W.Va.Code § 55–7B–6. As noted above, we determined in *Daniel* that cases which fall under the Medical Professional Liability Act are controlled by the provisions of that Act. In that regard, W.Va.Code § 55–7B–6(a) plainly states, "a mandatory status conference *shall be held* at which ... the parties *shall* ... [o]n behalf of the plaintiff, certify to the court that either an expert witness has or will be retained to testify on behalf of the plaintiff as to the applicable standard of care or that under the alleged facts of the action, no expert witness will be required." (Emphasis added). As this

Court has stated on many previous occasions, " ' " '[w]here the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation.' Syllabus Point 2[,] *State v. Elder,* 152 W.Va. 571, 165 S.E.2d 108 (1968)." Syl. pt. 1, *Peyton v. City Council of Lewisburg,* 182 W.Va. 297, 387 S.E.2d 532 (1989).' Syl. pt. 3, *Hose v. Berkeley County Planning Commission,* 194 W.Va. 515, 460 S.E.2d 761 (1995)." Syllabus Point 2, *Mallamo v. Town of Rivesville,* 197 W.Va. 616, 477 S.E.2d 525 (1996).

■ Thus, to further clarify our decision in *Daniel,* we hold that the provisions of the Medical Professional Liability Act, W.Va. Code §§ 55–7B–1 to –11, govern actions falling within its parameters, subject to this Court's power to promulgate rules for all cases and proceedings, including rules of practice and procedure, pursuant to Article VIII, Section 3 of the West Virginia Constitution.[6] We further hold that the necessity of expert witnesses in medical malpractice cases must be resolved during the mandatory status conference required by W.Va.Code § 55–7B–6. Accordingly, dates set forth in an initial scheduling order entered by the court pursuant to W.Va.R.Civ.P. 16 for the identification of expert witnesses are not controlling.[7]

**6.** Article VIII, Section 3 of the West Virginia Constitution provides that this Court "shall have power to promulgate rules for all cases and proceedings, civil and criminal, for all of the courts of the State relating to writs, warrants, process, practice and procedure, which shall have the force and effect of law."

**7.** The issue presented in the instant case was predicted in the concurring opinion of *Daniel.* In that concurrence, the following practical solution was proposed for harmonizing W.Va.Code § 55–7B–6(a) with Rule 16:

> Under W.Va.Code § 55–7B–6(a) a mandatory status conference must occur in a medical malpractice case "not less than nine nor more than twelve months following the filing of answer by all defendants[.]" This provision of the statute must be harmonized with Rule 16, which includes no time period specifically designated for holding any type of status conference under Rule 16.
>
> In practice, trial courts should address the § 55–7B–6 mandatory status conference through the Rule 16 scheduling procedure. In

> other words, the initial scheduling order should provide the date that the court and parties will convene for the mandatory status conference. When this procedure is followed, the problem presented in the instant case should not arise, so long as the status conference is scheduled reasonably prior to the date the parties are required to designate their expert witnesses.
>
> . . . .
>
> Also, the statute contemplates a meaningful hearing on the issue of a medical expert. During the conference the parties should be prepared to discuss substantive issues in the case as they relate to medical expert testimony. This is necessary as the trial court must ultimately determine whether to require medical expert testimony. An accurate record of the conference should be made to allow for a meaningful review should a party later challenge the basis of the trial court's decision. *Daniel,* 209 W.Va. at 208–09, 544 S.E.2d at 910–911 (Davis, J., Maynard, J., concurring). Thus, although W.Va Code § 55–7B–6 requires "the defendant to schedule such a conference," as a practical matter, this Court encourages circuit

In so holding, we are of course mindful of the fact that W.Va.Code § 55–7B–6 only requires the plaintiff to certify whether expert testimony is necessary in the case. Nonetheless, we believe the statute is ancipital and applies equally to defendants. Obviously, defendants cannot be required to disclose expert witnesses before the plaintiff has done so. The purpose of W.Va.Code § 55–7B–6 is to allow both the court and the parties to have a clear understanding of the issues in the case, the contested facts, and the identity of all medical expert witnesses in the case. Given the nature of medical malpractice cases, expert medical testimony is almost always crucial. By determining the nature and extent of the medical expert testimony which will be necessary at trial during the status conference required by W.Va.Code § 55–7B–6, courts should be able to avoid situations like those existing in the instant case where the petitioners identified an unreasonably excessive number of expert witnesses.

Accordingly, we hold that neither the plaintiff nor the defendant in an action filed pursuant to the Medical Professional Liability Act shall be required to disclose expert witnesses before the status conference required by W.Va.Code § 55–7B–6 has been held.[8] Moreover,

> Upon a trial court's determination that an expert witness is required to prove standard of care or proximate cause in an action brought under the West Virginia Medical Professional Liability Act, West Virginia Code §§ 55–7B–1 to –11 (1986) (Repl. Vol.2000), a reasonable period of time must be provided for retention of an expert witness.

Syllabus Point 4, *Daniel.*

This Court feels that it would be remiss by not addressing the circuit court's concerns regarding the delay of discovery in medical malpractice cases caused by the requirements of W.Va.Code § 55–7B–6. The statute provides that the mandatory status conference should be held "not less than nine nor more than twelve months following the filing of answer by all defendants[.]" The court astutely pointed out that "[t]his delay in discovery seems contrary to the pronouncements of our legislature to expedite medical malpractice cases" and "contrary to the efficient management of a case on the circuit court's active docket." We agree with the trial court that the statute thwarts any attempt to "fast track" medical malpractice actions so that they can be resolved in less than a year. However, we have heretofore observed that,

> " ' "A statute should be so read and applied as to make it accord with the spirit, purposes and objects of the general system of law of which it is intended to form a part; it being presumed that the legislators who drafted and passed it were familiar with all existing law, applicable to the subject matter, whether constitutional, statutory or common, and intended the statute to harmonize completely with the same and aid in the effectuation of the general purpose and design thereof, if its terms are consistent therewith." Syllabus Point 5, *State v. Snyder,* 64 W.Va. 659, 63 S.E. 385 (1908).' Syl. Pt. 1, *State ex rel. Simpkins v. Harvey,* 172 W.Va. 312, 305 S.E.2d 268 (1983), *superseded by statute on other grounds as stated in State ex rel. Hagg v. Spillers,* 181 W.Va. 387, 382 S.E.2d 581 (1989)." Syl. Pt. 2, *State ex rel. Hall v. Schlaegel,* 202 W.Va. 93, 502 S.E.2d 190 (1998).

Syllabus Point 11, *Rice v. Underwood,* 205 W.Va. 274, 517 S.E.2d 751 (1998). We cannot say that W.Va.Code § 55–7B–6 is inconsistent with the other provisions of the Medical Professional Liability Act. In fact, as

---

courts to address the mandatory status conference required by the statute through the Rule 16 scheduling procedure. As set forth above, the best practice would be for the court to set a date for the mandatory conference and schedule a time for designation of experts thereafter.

**8.** We note that the initial scheduling order entered by the court in this case required the simultaneous disclosure of expert witnesses. Although

the parties have not raised the issue, this Court feels compelled to urge trial courts (who do not already do so) to adopt the practice of having the party bearing the burden of proof disclose its expert witnesses first. Then, within a short but reasonable period of time, the party not bearing the burden of proof should disclose its expert witnesses. Such a procedure helps to avoid unfair surprise and allows for the orderly development of the case.

discussed above, the mandatory status conference serves an important function because it provides an opportunity for the parties to clarify the issues and outline the disputed facts. Moreover, the unfortunate reality is that most medical malpractice cases are not resolved in less than twelve months. Thus, in some instances, the conference may actually help resolve a medical malpractice case more quickly.

 Although we grant the petitioners the relief they have requested based on the fact that the circuit court has not held the mandatory status conference required by W.Va.Code § 55–7B–6, we believe that it is necessary to briefly address the petitioners initial argument that Dr. Nuovo's testimony cannot be limited because he was timely disclosed as an expert witness. The circuit court determined that the petitioner's second disclosure regarding Dr. Nuovo's expected testimony, i.e., that he would testify that the decedent died of rotavirus, was "highly prejudicial" because it injected a new theory of causation into the case. However, based upon the documents submitted to this court with the petition for writ of prohibition and the response thereto, it appears that Ms. Vilga was aware of the fact that Dr. Nuovo was continuing to review the medical evidence in this case and was engaged in an ongoing process of forming his opinion. In fact, Ms. Vilga took Dr. Nuovo's deposition after the petitioners disclosed that Dr. Nuovo was going to testify that the decedent died of rotavirus. Thus, we do not believe that Ms. Vilga was prejudiced by the petitioner's second disclosure concerning Dr. Nuovo's testimony.

 This Court notes that it is fairly common practice for experts to amend their opinion as the case develops. In that regard, Rule 703 of the West Virginia Rules of Evidence provides that:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert *at or before the hearing.* If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

(Emphasis added). Of course, a court can limit the admission of any testimony to prevent unfair prejudice and trial by ambush. However, in this particular instance, it does not appear that Ms, Vilga was prejudiced by the petitioners disclosure that Dr. Nuovo was going to testify that the decedent died of rotavirus, especially since the cause of Mr. Vilga's death is a pivotal and central issue of the case.

### B. Ruling Limiting the Number of Expert Witnesses

 The petitioners also contend that the circuit court erred by ruling that they could not elicit standard of care opinions from both Dr. Callahan and Dr. Lee Smith, their retained expert in the field of emergency medicine. Following the petitioner's initial disclosure of ten expert witnesses, the circuit court ruled that each party could only utilize one expert per field of expertise to testify as to alleged deviations from the applicable standard of care. Accordingly, the court stated that if Dr. Callahan, who was a treating physician, was going to give an opinion about whether his care and treatment of the decedent satisfied the applicable standard of care, then Dr. Callahan would not be permitted to present an independently-retained expert to also testify regarding the standard of care.

 This Court has held that " ' "[t]he action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." Syl. pt. 5, *Casto v. Martin*, 159 W.Va. 761, 230 S.E.2d 722 (1976) citing Syl. pt. 10, *State v. Huffman*, 141 W.Va. 55, 87 S.E.2d 541 (1955).' Syllabus Point 2, *State v. Rector*, 167 W.Va. 748, 280 S.E.2d 597 (1981)." Syllabus Point 3, *State v. Oldaker*, 172 W.Va. 258, 304 S.E.2d 843 (1983). In the case at bar, it is apparent that the circuit court felt that a ruling limiting the number of experts that would be permitted to testify at trial was needed because of the excessive number of witnesses identified by the petitioners. The court obviously sought to prevent duplicative and cumulative testi-

mony. Such a ruling is certainly permitted and appropriate under the circumstances. However, we believe the circuit court abused its discretion in ruling that Dr. Callahan would not be permitted to present the testimony of his independently-retained expert in the field of emergency care medicine, .if he chose to testify himself that he complied with the applicable standard of care.

■ While a defendant physician can certainly give testimony as an expert witness on his own behalf, *see* 32 C.J.S. *Evidence* § 637 (1996), we believe that it would be unduly harsh and restrictive to prohibit that same defendant physician from presenting the testimony of an independently-retained expert on the basis that the testimony would be cumulative. A medical malpractice case presents a unique situation wherein the testimony of a defendant physician often qualifies as expert testimony even when he or she only intends to testify as a fact witness. In that regard, a defendant physician cannot usually explain his or her conduct without giving some testimony that is expert in nature. Conversely, a defendant physician who wishes to give expert testimony on his or her own behalf subjects himself or herself to cross-examination about the motives underlying such testimony. Specifically, the defendant physician's expert opinion may be seen by the jury as self-serving and biased. Given these unique circumstances, we believe the circuit court abused its discretion by ruling that Dr. Callahan could not present the testimony of Dr. Smith if he chose to testify as an expert on his own behalf.

## IV. CONCLUSION

Accordingly, for the reasons set forth above, we grant the requested writ of prohibition as moulded.

Writ granted as moulded.