733 A.2d 456

JEAN MATTHIES, PLAINTIFF–RESPONDENT, v. EDWARD D. MASTROMONACO, D.O., DEFENDANT–APPELLANT.

Argued February 16, 1999—Decided July 8, 1999.

*Melvin Greenberg* argued the cause for appellant (*Greenberg Dauber & Epstein*, attorneys; *Mr. Greenberg* and *Michael H. Freeman*, on the briefs).

*Arthur J. Messineo, Jr.*, argued the cause for respondent (*Messineo & Messineo*, attorneys; *Nancy C. Ferro*, on the brief).

The opinion of the Court was delivered by

POLLOCK, J.

This appeal presents the question whether the doctrine of informed consent requires a physician to obtain the patient's consent before implementing a nonsurgical course of treatment. It questions also whether a physician, in addition to discussing with the patient treatment alternatives that the physician recommends, should discuss medically reasonable alternative courses of

treatment that the physician does not recommend. We hold that to obtain a patient's informed consent to one of several alternative courses of treatment, the physician should explain medically reasonable invasive and noninvasive alternatives, including the risks and likely outcomes of those alternatives, even when the chosen course is noninvasive.

The Law Division concluded that plaintiff, Jean Matthies, could not assert a cause of action for breach of the duty of informed consent against defendant, Dr. Edward D. Mastromonaco. According to the court, a physician must secure a patient's informed consent only to invasive procedures, not to those that are noninvasive. Consequently, the court prevented Matthies from presenting evidence that Dr. Mastromonaco had not obtained her informed consent to use bed-rest treatment, which is noninvasive, instead of surgery. On the issue whether Dr. Mastromonaco had committed malpractice by failing to perform surgery on Matthies, the jury returned a verdict of no cause for action. The Appellate Division reversed, holding that the doctrine of informed consent applies even when the course of treatment implemented by the physician is noninvasive. 310 *N.J.Super.* 572, 709 *A.*2d 238 (App. Div.1998) We granted Dr. Mastromonaco's petition for certification, 156 *N.J.* 406, 719 *A.*2d 638 (1998), and now affirm.

## I.

In 1990, Matthies was eighty-one years old and living alone in the Bella Vista Apartments, a twenty-three-story senior citizen residence in Union City. On August 26, 1990, she fell in her apartment and fractured her right hip. For two days, she remained undiscovered. When found, she was suffering the consequences of a lack of prompt medical attention, including dehydration, distended bowels, and confusion. An emergency service transported her to Christ Hospital in Jersey City. She was treated in the emergency room and admitted to the intensive care unit.

One day after Matthies's admission, her initial treating physician called Dr. Mastromonaco, an osteopath and board-certified orthopedic surgeon, as a consultant. Dr. Mastromonaco reviewed Matthies's medical history, condition, and x-rays. He decided against pinning her hip, a procedure that would have involved the insertion of four steel screws, each approximately one-quarter inch thick and four inches long.

Dr. Mastromonaco reached that decision for several reasons. First, Matthies was elderly, frail, and in a weakened condition. Surgery involving the installation of screws would be risky. Second, Matthies suffered from osteoporosis, which led Dr. Mastromonaco to conclude that her bones were too porous to hold the screws. He anticipated that the screws probably would loosen, causing severe pain and necessitating a partial or total hip replacement. Third, forty years earlier, Matthies had suffered a stroke from a mismatched blood transfusion during surgery. The stroke had left her partially paralyzed on her right side. Consequently she had worn a brace and essentially used her right leg as a post while propelling herself forward with her left leg. After considering these factors, Dr. Mastromonaco decided that with bed rest, a course of treatment that he recognized as "controversial," Matthies's fracture could heal sufficiently to restore her right leg to its limited function. He prescribed a "bed-rest treatment," which consisted of complete restriction to bed for several days, followed by increasingly extended periods spent sitting in a chair and walking about the room.

Before her fall, Matthies had maintained an independent lifestyle. She had done her own grocery shopping, cooking, housework, and laundry. Her dentist of many years, Dr. Arthur Massarsky, testified that he often had observed Matthies climbing unassisted the two flights of stairs to his office. Matthies is now confined to a nursing home.

Matthies's expert, Dr. Hervey Sicherman, a board-certified orthopedic surgeon, testified that under the circumstances, bed rest was an inappropriate treatment. He maintained that bed rest

alone is not advisable for a hip fracture unless the patient does not expect to regain the ability to walk. Essentially, he rejected bed rest except when the patient is terminally ill or in a vegetative state. Dr. Sicherman explained that unless accompanied by traction, the danger of treating a hip fracture with bed rest is that the fracture could dislocate. In fact, shortly after Matthies began her bed-rest treatment, the head of her right femur displaced. Her right leg shortened, and she has never regained the ability to walk. According to Dr. Sicherman, the weakness and porosity of Matthies's bones increased the likelihood of this bad outcome. Even defendant's expert, Dr. Ira Rochelle, another board-certified orthopedic surgeon, admitted that pinning Matthies's hip would have decreased the risk of displacement. He nonetheless agreed with Dr. Mastromonaco that Matthies's bones were probably too brittle to withstand the insertion of pins.

Dr. Mastromonaco's goal in conservatively treating Matthies was to help her "get through this with the least complication as possible and to maintain a lifestyle conducive to her disability." He believed that rather than continue living on her own, Matthies should live in a long-term care facility. He explained, "I'm not going to give her that leg she wanted. She wanted to live alone, but she couldn't live alone.... I wanted her to be at peace with herself in the confines of professional care, somebody to care for her. She could not live alone."

Matthies asserts that she would not have consented to bed rest if Dr. Mastromonaco had told her of the probable effect of the treatment on the quality of her life. She claims that Dr. Mastromonaco knew that without surgery, she never would walk again. He did not provide her, however, with the opportunity to choose between bed rest and the riskier, but potentially more successful, alternative of surgery. Dr. Mastromonaco maintained that bed rest did not foreclose surgery at a later date.

A jury question existed whether Dr. Mastromonaco consulted either with plaintiff or her family about the possibility of surgery. The trial court permitted Dr. Mastromonaco to testify that he had

discussed surgical alternatives with Matthies, but that she had refused them because of her concern about the risks of a blood transfusion. Matthies's daughter, Jean Kurzrok, who also spoke with Dr. Mastromonaco, testified that he had said that her mother did not need or want surgery. Kurzrok said that she told Dr. Mastromonaco, "Well, if she doesn't need it, she doesn't want it." According to Ms. Kurzrok, Dr. Mastromonaco never discussed the treatment alternatives or their probable outcomes. Instead, he minimized the fracture, describing it as "just a little crack" that was "going to heal itself."

Matthies remained at Christ Hospital until October 1990. She was then discharged to the Andover Intermediate Care Center, a residential nursing home in which she received physical therapy. While at Andover, Matthies was attended by several physicians, including orthopedic surgeons. Those doctors continued the conservative treatment begun by Dr. Mastromonaco. Matthies also saw psychiatrists and was treated at Andover for depression because she grew increasingly despondent over her continued inability to walk.

In January 1993, Matthies was transferred to the Castle Hill Health Care Center, another residential care facility. Except for hospital stays, she has remained at Castle Hill.

In June 1995, Matthies was admitted to Orange Hospital for knee surgery. She spent September to October 1995 at St. Francis Hospital following a hip replacement. Her hip replacement, five years after her fall, resulted in life-threatening complications, including serious blood clots and infections. Although she recovered, the bone density in her right femur could not support the hip implant. Consequently, her right femur broke below the implant, and she underwent a second hip replacement. Even after that procedure, however, the unequal lengths of Matthies's legs have prevented her from walking. She is confined to a bed or chair and is completely dependent on others.

Matthies sued Dr. Mastromonaco on two theories. First, she claimed that he had deviated from standard medical care by failing

to pin her hip at the time of her injury. Second, she asserted that he negligently had failed to obtain her informed consent to bed rest as a treatment alternative. Specifically, Matthies contended that Mastromonaco had failed to disclose the alternative of surgery.

Dr. Mastromonaco's counsel argued that informed consent was irrelevant in a case in which the treatment administered was noninvasive. Accepting that argument, the trial court refused to charge the jury on the issue of lack of informed consent. It reasoned that the malpractice claim subsumed the claim for lack of informed consent. The court nevertheless permitted Dr. Mastromonaco to testify that he had explained the surgical alternative to Matthies. As Dr. Mastromonaco explained, Matthies had said that she "did not want" surgery, because she was afraid of a blood transfusion. The trial court, however, prevented Matthies's counsel from cross-examining Dr. Mastromonaco on that point.

The jury concluded that Dr. Mastromonaco, in deciding not to perform immediate surgery, had not deviated from the accepted standard of medical care. Accordingly, it returned a verdict of no cause for action on Matthies's medical malpractice claim.

The Appellate Division reversed. 310 *N.J.Super.* at 572, 709 *A.*2d 238. Observing that New Jersey's doctrine of informed consent is based not on battery, but on negligence, the court concluded that the doctrine applies to noninvasive, as well as invasive, procedures. *Id.* at 589–94, 709 *A.*2d 238. A physician has a duty to disclose information that will enable a patient "to consider and weigh knowledgeably the options available and the risk attendant to each." *Id.* at 593, 709 *A.*2d 238 (citation omitted). At a minimum, Dr. Mastromonaco should have explained to Matthies the risks of bed rest and his reasons for recommending it as a course of treatment. *Id.* at 596, 709 *A.*2d 238. The court observed: "Defendant's own testimony suggests that he made the decision to treat plaintiff conservatively after assessing her physical condition and determining that plaintiff would be better off in the care of others, *i.e.* that she could not live alone. As we have

held, this was not defendant's decision to make." *Id.* at 595, 709 A.2d 238.

In sum, the Appellate Division concluded that the trial court's restriction on the presentation of evidence on Matthies's informed consent claim also affected her medical malpractice claim. *Id.* at 599, 709 A.2d 238. Consequently, the court remanded for a new trial on both issues.

## II.

Choosing among medically reasonable treatment alternatives is a shared responsibility of physicians and patients. To discharge their responsibilities, patients should provide their physicians with the information necessary for them to make diagnoses and determine courses of treatment. Physicians, in turn, have a duty to evaluate the relevant information and disclose all courses of treatment that are medically reasonable under the circumstances. Generally, a physician will recommend a course of treatment. As a practical matter, a patient often decides to adopt the physician's recommendation. Still, the ultimate decision is for the patient.

We reject defendant's contention that informed consent applies only to invasive procedures. Historically, the failure to obtain a patient's informed consent to an invasive procedure, such as surgery, was treated as a battery. The physician's need to obtain the consent of the patient to surgery derived from the patient's right to reject a nonconsensual touching. Eventually, courts recognized that the need for the patient's consent is better understood as deriving from the right of self-determination. *Canesi v. Wilson*, 158 *N.J.* 490, 503–04, 730 *A.*2d 805 (1999); *Schloendorff v. Society of N.Y. Hosp.*, 211 *N.Y.* 125, 105 *N.E.* 92, 93 (1914). A shrinking minority of jurisdictions persist in limiting informed consent actions to invasive procedures. In those jurisdictions, battery survives as the appropriate cause of action. *See, e.g., Karlsons v. Guerinot*, 57 *A.D.*2d 73, 394 *N.Y.S.*2d 933, 939 (1977) (limiting application of informed consent to "those situations

where the harm suffered arose from some affirmative violation of the patient's physical integrity such as surgical procedures, injections or invasive diagnostic tests"); *Morgan v. MacPhail*, 550 *Pa.* 202, 704 *A.*2d 617, 619 (1997) (stating that informed consent in Pennsylvania "has not been required in cases involving non-surgical procedures"). Most jurisdictions view the failure to obtain a patient's informed consent as an act of negligence or malpractice, not battery. *See, e.g.,* Joan P. Dailey, *The Two Schools of Thought and Informed Consent Doctrines in Pennsylvania: A Model For Integration,* 98 *Dick. L.Rev.* 713, 727–28 & n. 101 (stating battery basis recognized in only minority of jurisdictions, for example, Georgia, Pennsylvania, and Virginia); Paula Walter, *The Doctrine of Informed Consent: To Inform or Not To Inform?,* 71 *St. John's L.Rev.* 543, 543, 558–59 (1997) (noting that two 1980 cases moved informed consent doctrine of New York, one of few remaining battery jurisdictions, toward theory of negligence).

The rationale for basing an informed consent action on negligence rather than battery principles is that the physician's failure is better viewed as a breach of professional responsibility than as a nonconsensual touching. *Baird v. American Med. Optics,* 155 *N.J.* 54, 70–71, 713 *A.*2d 1019 (1998); *Largey v. Rothman,* 110 *N.J.* 204, 207–08, 540 *A.*2d 504 (1988). As we have stated, "Informed consent is a negligence concept predicated on the duty of a physician to disclose to a patient information that will enable him to 'evaluate knowledgeably the options available and the risks attendant upon each' before subjecting that patient to a course of treatment." *Perna v. Pirozzi,* 92 *N.J.* 446, 459, 457 *A.*2d 431 (1983); *see also Kaplan v. Haines,* 96 *N.J.Super.* 242, 257, 232 *A.*2d 840 (App.Div.1967), *aff'd o.b.,* 51 *N.J.* 404, 241 *A.*2d 235 (1968) (sanctioning negligence-view, lack-of-informed-consent tort twenty years prior to *Largey* ). Analysis based on the principle of battery is generally restricted to cases in which a physician has not obtained any consent or has exceeded the scope of consent. 3 David W. Louisell & Harold Williams, *Medical Malpractice* §§ 22.02, 22.03 (1999). The essential difference in analyzing in-

formed consent claims under negligence, rather than battery principles, is that the analysis focuses not on an unauthorized touching or invasion of the patient's body, but on the physician's deviation from a standard of care.

In informed consent analysis, the decisive factor is not whether a treatment alternative is invasive or noninvasive, but whether the physician adequately presents the material facts so that the patient can make an informed decision. That conclusion does not imply that a physician must explain in detail all treatment options in every case. For example, a physician need not recite all the risks and benefits of each potential appropriate antibiotic when writing a prescription for treatment of an upper respiratory infection. Conversely, a physician could be obligated, depending on the circumstances, to discuss a variety of treatment alternatives, such as chemotherapy, radiation, or surgery, with a patient diagnosed with cancer. Distinguishing the two situations are the limitations of the reasonable patient standard, which need not unduly burden the physician-patient relationship. The standard obligates the physician to disclose only that information material to a reasonable patient's informed decision. *Largey, supra,* 110 *N.J.* at 211–12; , 540 *A.*2d 504 3 Louisell & Williams, *supra,* § 22.03(2). Physicians thus remain obligated to inform patients of medically reasonable treatment alternatives and their attendant probable risks and outcomes. Otherwise, the patient, in selecting one alternative rather than another, cannot make a decision that is informed.

To the extent that *Parris v. Sands,* 21 *Cal.App.*4th 187, 25 *Cal.Rptr.*2d 800 (Ct.App.1993), on which Dr. Mastromonaco relies, would not require a physician to inform a patient of alternative treatments, we disagree with that decision. *Parris,* however, is distinguishable. It involved not the failure of a physician to inform a patient of a nonrecommended treatment alternative, but the alleged negligence of the physician in diagnosing the patient's pneumonia as viral rather than bacterial. *See* 3 Louisell & Williams, *supra,* § 22.04(3)(c) & n. 18. The extent to which the

reasonable patient standard obligates physicians to disclose the details of alternative diagnoses, as distinguished from treatment alternatives, is not before us. In sum, physicians do not adequately discharge their responsibility by disclosing only treatment alternatives that they recommend.

To assure that the patient's consent is informed, the physician should describe, among other things, the material risks inherent in a procedure or course of treatment. *Largey, supra,* 110 *N.J.* at 210–13, 540 *A.*2d 504. The test for measuring the materiality of a risk is whether a reasonable patient in the patient's position would have considered the risk material. *Id.* at 211–12, 540 *A.*2d 504. Although the test of materiality is objective, a "patient obviously has no complaint if he would have submitted to the therapy notwithstanding awareness that the risk was one of its perils." *Canterbury v. Spence,* 464 *F.*2d 772, 790 (D.C.Cir.), *cert. denied,* 409 *U.S.* 1064, 93 *S.Ct.* 560, 34 *L.Ed.*2d 518 (1972) (citation omitted). As the court stated in *Canterbury:*

> We think a technique which ties the factual conclusion on causation simply to the assessment of the patient's credibility is unsatisfactory.... [W]hen causality is explored at a postinjury trial with a professedly uninformed patient, the question whether he actually would have turned the treatment down if he had known the risks is purely hypothetical.... And the answer which the patient supplies hardly represents more than a guess, perhaps tinged by the circumstance that the uncommunicated hazard has in fact materialized. In our view, this method of dealing with the issue on causation comes in second-best.... Better it is, we believe, to resolve the causality issue on an objective basis: in terms of what a prudent person in the patient's position would have decided if suitably informed of all perils bearing significance. If adequate disclosure could reasonably be expected to have caused that person to decline the treatment because of the revelation of the kind of risk or danger that resulted in harm, causation is shown, but otherwise not. The patient's testimony is relevant on that score of course but it would not threaten to dominate the findings. And since that testimony would probably be appraised congruently with the factfinder's belief in its reasonableness, the case for a wholly objective standard for passing on causation is strengthened.
>
> [*Id.* at 790–91; *see also Largey, supra,* 110 *N.J.* at 215–16, 540 *A.*2d 504 (approving *Canterbury* 's adoption of objective test); *Model Jury Charge* 5.36C (1989) ("Although plaintiff's testimony may be considered on the question as to whether he/she would have consented, the issue to be resolved is not what this plaintiff would have done....").]

 For consent to be informed, the patient must know not only of alternatives that the physician recommends, but of medically reasonable alternatives that the physician does not recommend. Otherwise, the physician, by not discussing these alternatives, effectively makes the choice for the patient. Accordingly, the physician should discuss the medically reasonable courses of treatment, including nontreatment. *Largey, supra,* 110 *N.J.* at 213, 540 *A.2d* 504. As we recently wrote: "The negligence lies in the physician's failure to disclose sufficient information for the patient to make an informed decision about the comparative risks of various treatment options." *Baird, supra,* 155 *N.J.* at 71, 713 *A.2d* 1019; *In re Conroy,* 98 *N.J.* 321, 347, 486 *A.2d* 1209 (1985) ("[T]he patient must have a clear understanding of the risks and benefits of the proposed treatment alternatives or nontreatment...."); *Battenfeld v. Gregory,* 247 *N.J.Super.* 538, 550, 589 *A.2d* 1059 (App.Div.1991) ("We are convinced ... that a physician may be held liable for withholding information concerning the potential harm likely to result if the patient remains untreated."). To the same effect, the Department of Health has declared:

> Similar concerns animate our Administrative Code's "patient rights," which include a patient's right "[t]o receive from the patient's physician[s]—in terms that the patient understands—an explanation of his or her complete medical condition, recommended treatment, risk[s] of the treatment, expected results and reasonable medical alternatives."
>
> [*N.J.A.C.* 8:43G–4.1(a)(6).]

The medical profession likewise recognizes the physician's obligation to explain all medically reasonable alternatives to the patient. The American Medical Association's Code of Medical Ethics states:

> The patient's right of self-decision can be effectively exercised only if the patient possesses enough information to enable an intelligent choice. The patient should make his or her own determination on treatment. The physician's obligation is to present the medical facts accurately to the patient or to the individual responsible for the patient's care and to make recommendations for management in accordance with good medical practice.... Social policy does not accept the paternalistic view that the physician may remain silent because divulgence might prompt the patient to forego needed therapy. Rational, informed patients should not be expected to act uniformly, even under similar circumstances, in agreeing to or refusing treatment.

[American Medical Association, *Code of Medical Ethics: Current Opinions with Annotations,* Opinion 8.08 (1981).]

Because the patient has a right to be fully informed about medically reasonable courses of treatment, we are unpersuaded that a cause of action predicated on the physician's breach of a standard of care adequately protects the patient's right to be informed of treatment alternatives. A physician may select a method of treatment that is medically reasonable, but not the one that the patient would have selected if informed of alternative methods. Like the deviation from a standard of care, the physician's failure to obtain informed consent is a form of medical negligence. *See Baird, supra,* 155 *N.J.* at 70, 713 *A.*2d 1019; *Teilhaber v. Greene,* 320 *N.J.Super.* 453, 457, 727 *A.*2d 518 (App. Div.1999). Recognition of a separate duty emphasizes the physician's obligation to inform, as well as treat, the patient. The physician's selection of one of several medically reasonable alternatives may not violate a standard of care, but it may represent a choice that the patient would not make. Physicians may neither impose their values on their patients nor substitute their level of risk aversion for that of their patients. One patient may prefer to undergo a potentially risky procedure, such as surgery, to enjoy a better quality of life. Another patient may choose a more conservative course of treatment to secure reduced risk at the cost of a diminished lifestyle. The choice is not for the physician, but the patient in consultation with the physician. By not telling the patient of all medically reasonable alternatives, the physician breaches the patient's right to make an informed choice.

The physician's duty to inform the patient of alternatives is especially important when the alternatives are mutually exclusive. If, as a practical matter, the choice of one alternative precludes the choice of others, or even if it increases appreciably the risks attendant on the other alternatives, the patient's need for relevant information is critical. That need intensifies when the choice turns not so much on purely medical considerations as on the choice of one lifestyle or set of values over another.

It is not dispositive that the alternative that the physician recommends is more or less invasive than other alternatives. *See Caputa v. Antiles,* 296 *N.J.Super.* 123, 686 *A.*2d 356 (App.Div. 1996) (holding doctor had duty to disclose alternative of "observation" as well as recommended alternative of surgery). The critical consideration is not the invasiveness of the procedure, but the patient's need for information to make a reasonable decision about the appropriate course of medical treatment, whether invasive or noninvasive.

According to Dr. Mastromonaco's testimony, he recognized that need. He testified that he discussed the alternative of surgery with Matthies. Whether that discussion ever took place and, if so, what the parties said, should have been an issue at trial.

The trial court, believing informed consent applied to invasive procedures only, precluded Matthies's attorney from cross-examining Dr. Mastromonaco on that issue. Several times during the trial, Matthies's counsel attempted to introduce testimony to refute Dr. Mastromonaco's assertion that he had discussed surgery as an option. Each time, the trial court barred the testimony. At the conclusion of the case, therefore, Dr. Mastromonaco had presented his side of the story on the issue of informed consent, but Matthies had been prevented from presenting her side. The trial court, moreover, refused to charge the jury on the issue of informed consent. Hence, the only issue submitted to the jury was whether Dr. Mastromonaco had breached a standard of care in selecting bed rest as a treatment alternative. Consequently, the jury did not have the opportunity to consider the issue that forms the basis of this appeal, whether Dr. Mastromonaco had obtained Matthies's informed consent to the treatment he recommended.

The issue of informed consent often intertwines with that of medical malpractice. *Baird, supra,* 155 *N.J.* at 70–71, 713 *A.*2d 1019. Because of the interrelationship between the malpractice

and informed consent issues in the present case, the jury should consider both issues at the retrial.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.