728 S.E.2d 87

**Loretta CLINE, Executrix of the Estate of Henry Cline, Plaintiff Below, Petitioner**

v.

**Kiren Jean KRESA–REAHL, M.D., Defendant Below, Respondent.**

No. 11–0351.

Supreme Court of Appeals of West Virginia.

Submitted April 17, 2012.

Decided May 29, 2012.

Richard D. Lindsay, Esq., Matthew C. Lindsay, Esq., Tabor Lindsay & Associates, Charleston, WV, for Petitioner.

Barry M. Taylor, Esq., Matthew L. Williams, Esq., Jenkins Fenstermaker, PLLC, Huntington, WV, for Respondent.

WORKMAN, Justice:

Petitioner, Loretta Cline, Executrix of the Estate of Henry Cline, appeals from the circuit court's dismissal of her complaint pursuant to West Virginia Rule of Civil Procedure 12(b)(1) and 12(b)(6). In her complaint, petitioner alleges, in part, that respondent, Dr. Kiren Jean Kresa–Reahl, negligently failed to advise her decedent of the availability of certain medications to treat his stroke. Prior to filing her complaint, petitioner refused to provide a pre-suit screening certificate of merit pursuant to the pre-suit requirements of the Medical Professional Liability Act, W. Va.Code §§ 55–7B–1 to –12 (2003) [hereinafter "the MPLA"], asserting that her claim fell within the exception to such requirements set forth in W. Va.Code § 55–7B–6(c) (2003)(Repl. Vol. 2008) as an "informed consent" claim. The circuit court disagreed, ruling that petitioner's complaint did not state a recognized informed consent claim and that therefore, her failure to provide a screening certificate of merit warranted dismissal without prejudice. For the reasons set forth below, we find no reversible error and affirm the ruling of the lower court.

## I. FACTS AND PROCEDURAL HISTORY

On February 21, 2009, petitioner's decedent, Henry Cline [hereinafter "Mr. Cline"], presented to Charleston Area Medical Center, General Division, just before 10:00 p.m. with complaints of headache, one-sided weakness, and difficulty speaking. The emergency room physician contacted respondent Dr. Kiren Kresa–Reahl, the neurologist on call, to review Mr. Cline's condition. Petitioner contends that Mr. Cline had suffered a

stroke and that there are two recognized "methods of treatment" for a stroke: conservative measures (bedrest, medications, and observation) and thrombolytic therapy (administration of "clot-busting" medication). Petitioner alleges that upon speaking with the emergency room physician, respondent determined that given Mr. Cline's history of prostate cancer, thrombolytic therapy was not appropriate and admitted him to the ICU.[1] Mr. Cline died the following morning. Petitioner contends that respondent never spoke directly with either Mr. Cline or petitioner; Dr. Kresa–Reahl appears not to dispute this contention.

On July 6, 2009, petitioner sent respondent a "Notice of Claim" as required by the MPLA, but did not provide a screening certificate of merit.[2] The Notice of Claim was entitled "Notice of Claim and Statement Pursuant to West Virginia Code § 55–7B–6(c)"[3] and stated simply that petitioner intended to file a lawsuit against her and that "[n]o expert witness is needed as Mr. Cline did not receive adequate information regarding treatment options during the latter part of the night of February 22, 2009 through the morning of February 23, 2009, specifically you failed to advise Mr. Cline of the option of thrombolytic treatment of his stroke, resulting in his death[.]" On August 4, 2009, respondent's attorney wrote to petitioner's attorney and specifically objected to the absence of a screening certificate of merit and requested a more definite statement, including answers to thirteen specific inquiries about Mr. Cline's condition and how petitioner intended to establish liability. The next day, petitioner's counsel responded in writing and addressed the absence of the certificate of merit stating: "We feel we have fully complied with the statutory and case law requirements for the filing of our claim." Petitioner filed suit on October 29, 2009, alleging that respondent was negligent in "failing to properly and appropriately advise Henry Cline that thrombolytics were a treatment option[.]" Notably, however, petitioner also alleged that respondent was negligent in "failing to properly and appropriately administer and/or order the administration of thrombolytic medications to Henry Cline[.]" Despite the allegation of this standard medical negligence claim, petitioner likewise provided no screening certificate of merit in support of this claim, nor even referenced this allegation in her pre-suit notice.[4]

Respondent answered and filed a Motion to Dismiss on the basis that petitioner failed to provide a screening certificate of merit. In response, petitioner argued that she had pled an "informed consent" cause of action, i.e., for respondent's failure to advise petitioner's decedent of the "option" of thrombo-

---

1. Petitioner's complaint alleges that "Dr. Kresa–Reahl felt that Henry Cline was not a candidate for thrombolytic therapy based on his use of radiation seeding to treat prostate cancer in 2007." Although unsupported by any evidence in the record due to the stage at which the case was dismissed, respondent asserts in her brief below that given that she was consulted more than three hours after symptom onset and that Mr. Cline died within twelve hours of symptom onset, it is well-established that thrombolytic therapy would have been of no benefit.

2. W. Va.Code § 55–7B–6(b) provides, in part:

At least thirty days prior to the filing of a medical professional liability action against a health care provider, the claimant shall serve by certified mail, return receipt requested, a notice of claim on each health care provider the claimant will join in litigation. The notice of claim shall include a statement of the theory or theories of liability upon which a cause of action may be based, and a list of all health care providers and health care facilities to whom notices of claim are being sent, together with a screening certificate of merit. The screening certificate of merit shall be executed under oath by a health care provider qualified as an expert under the West Virginia Rules of Evidence and shall state with particularity: (1) The expert's familiarity with the applicable standard of care in issue; (2) the expert's qualifications; (3) the expert's opinion as to how the applicable standard of care was breached; and (4) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death...."

3. W. Va.Code § 55–7B–6(c) is the MPLA's exception to the necessity of a screening certificate of merit discussed more fully *infra*.

4. Petitioner's counsel conceded during oral argument that such failure was fatal to that particular claim, although it was not addressed in the lower court's order nor was it assigned as error in this appeal.

lytics, and that, as such, an expert was not needed under the common law to establish the scope of a physician's duty to disclose medical information or breach thereof. Accordingly, petitioner argued that W. Va.Code § 55–7B–6(c)'s exception to the necessity of a certificate of merit for "well-established legal theor[ies] of liability which do[ ] not require expert testimony supporting a breach of the applicable standard of care" applied.[5] The circuit court disagreed, concluding that the duty to obtain informed consent applies only to "recommended treatment[s] or procedure[s]" and that, since respondent did not recommend thrombolytic therapy, the case did not constitute an informed consent case. Therefore, petitioner's claim sounded in pure medical negligence and a screening certificate of merit was required under the MPLA. Moreover, the court refused to permit petitioner an opportunity to correct her deficient pre-suit compliance by finding that plaintiff had a fair opportunity to address the insufficiency in response to counsel's pre-suit request and failed to do so. Notably, however, the circuit court dismissed petitioner's complaint *without* prejudice. This appeal followed.

## II. STANDARD OF REVIEW

■ In general, " '[a]ppellate review of a circuit court's order granting a motion to dismiss a complaint is *de novo.*' Syl. Pt. 2, *State ex rel. McGraw v. Scott Runyan Pontiac–Buick, Inc.,* 194 W.Va. 770, 461 S.E.2d 516 (1995)." Syl. Pt. 1, *Gray v. Mena,* 218 W.Va. 564, 625 S.E.2d 326 (2005). Likewise, " '[w]here the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review.' Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.,* 194 W.Va. 138, 459 S.E.2d 415 (1995)." Syl. Pt. 2, *Gray.*

## III. DISCUSSION

### A.

We first address the issue of whether petitioner has alleged a recognized cause of ac-

tion under the doctrine of informed consent. Petitioner argues that to the extent she has alleged an informed consent claim, well-established precedent holds that an expert is unnecessary to establish a breach of the standard of care. As such, she claims that no screening certificate of merit is required per W. Va.Code § 55–7B–6(c).

■ This Court first articulated a physician's duty of disclosure, violation of which may form the basis of an informed consent cause of action, in 1982. In Syllabus Point 2 of *Cross v. Trapp,* 170 W.Va. 459, 294 S.E.2d 446 (1982), the Court held:

> A physician has a duty to disclose information to his or her patient in order that the patient may give to the physician an informed consent to a particular medical procedure such as surgery. In the case of surgery, the physician ordinarily should disclose to the patient various considerations including (1) the possibility of the surgery, (2) the risks involved concerning the surgery, (3) alternative methods of treatment, (4) the risks relating to such alternative methods of treatment and (5) the results likely to occur if the patient remains untreated.

In establishing the standard by which a jury should evaluate the sufficiency of a physician's disclosure, we adopted the "patient need standard," which states that "the need of the patient for information material to his or her decision as to method of treatment, such as surgery, is the standard by which the physician's duty to disclose is measured." Syl. Pt. 3, in part, *id.* As such,

> the disclosure issue is approached from the reasonableness of the physician's disclosure or nondisclosure in terms of what the physician knows or should know to be the patient's informational needs. Therefore, whether a particular medical risk should be disclosed by the physician to the patient

---

5. W. Va.Code § 55–7B–6(c) provides, in part:

[I]f a claimant or his or her counsel[ ] believes that no screening certificate of merit is necessary because the cause of action is based upon a well-established legal theory of liability which does not require expert testi-

mony supporting a breach of the applicable standard of care, the claimant or his or her counsel, shall file a statement specifically setting forth the basis of the alleged liability of the health care provider in lieu of a screening certificate of merit.

under the patient need standard ordinarily depends upon the existence and materiality of such risk with respect to the patient's decision relating to medical treatment.

*Id.* In adopting the patient need standard, we expressly rejected the "physician disclosure standard" which would define the duty of disclosure as that which a reasonably prudent physician would disclose under the same or similar circumstances. *Id.* at 463, 294 S.E.2d at 451.

■ Significantly, this Court went on to hold that since it was adopting the patient need standard, expert testimony was not required "to establish the scope of a physician's duty to disclose medical information to his or her patient[.]" Syl. Pt. 5, in part, *id.* However, the Court was very clear that irrespective of the foregoing,

> expert medical testimony *would ordinarily be required to establish certain matters including:* (1) the risks involved concerning a particular method of treatment, (2) *alternative methods of treatment,* (3) the risks relating to such alternative methods of treatment and (4) the results likely to occur if the patient remains untreated.

Syl. Pt. 5, in part, *id.*(emphasis added).

We further defined a physician's duty of disclosure in *Hicks v. Ghaphery,* 212 W.Va. 327, 571 S.E.2d 317 (2002). In *Hicks,* this Court upheld the trial court's refusal to give an informed consent instruction in a case where the plaintiff alleged that the defendant physician negligently failed to recommend insertion of a vena cava filter to prevent blood clots, to which plaintiff was susceptible as a paraplegic. *Id.* at 335, 571 S.E.2d at 325. Plaintiff requested an informed consent instruction arguing that if the jury believed that the doctor advised the plaintiff's decedent of the option of the vena cava filter, then the doctor must satisfy the informed · consent standard in *Cross. Id.* at 334, 571 S.E.2d at 324.

In determining whether the defendant had a duty to obtain informed consent for a non-recommended procedure, this Court analyzed two cases—*Matthies v. Mastromonaco,* 160 N.J. 26, 733 A.2d 456 (1999) and *Vandi v. Permanente Medical Group, Inc.,* 7 Cal. App.4th 1064, 9 Cal.Rptr.2d 463 (1992).

*Hicks,* 212 W.Va. at 334–35, 571 S.E.2d at 324–25. *Matthies* stands for the proposition that physicians have an obligation to disclose and inform patients of non-recommended, but *medically reasonable* alternative treatments. The *Matthies* court reasoned that "physicians do not adequately discharge their responsibility by disclosing only treatment alternatives that they recommend.... For consent to be informed, the patient must know not only of alternatives that the physician recommends, but of medically reasonable alternatives that the physician does not recommend." *Matthies,* 733 A.2d at 462. In contrast, *Vandi* holds that a physician is not obliged to obtain informed consent for non-recommended treatment. *Vandi,* 9 Cal. Rptr.2d at 467. In rejecting such a duty, the Court noted that "[i]t would be anomalous to create a legally imposed duty which would require a physician to disclose and offer to a patient a medical procedure which, in the exercise of his or her medical judgment, the physician does not believe to be medically indicated." *Id.* After examining both cases, this Court implicitly adopted the *Vandi* approach, rejecting an expansion of the duty to obtain informed consent to include non-recommended procedures. *Hicks,* 212 W.Va. at 335, 571 S.E.2d at 325. In upholding the circuit court's refusal to offer the informed consent instruction, we held that failure to recommend a particular treatment modality constituted simple medical negligence and should be treated as such:

> [T]he jury must assess a physician's failure to recommend a procedure in terms of whether he or she violated the applicable standard of care. In other words, "[i]f the procedure is one which should have been proposed, then the failure to recommend it would be negligence under ordinary medical negligence principles and there is no need to consider an additional duty of disclosure."

*Id.* at 335, 571 S.E.2d at 325 (quoting *Vandi,* 9 Cal.Rptr.2d at 467).

■ Moreover, in analyzing the particular facts of *Hicks,* we noted a critical distinction which is particularly applicable to the instant case. We explained that

this case does not involve a chosen course of treatment.[6] *To the contrary, the issue is the physician's decision to not perform a certain procedure,* i.e., insertion of a vena cava filter. As Syllabus Point 2 of *Cross, supra,* illustrates, the duty of disclosure is predicated upon a recommended treatment or procedure. Thus, by asserting that she was entitled to an informed consent instruction as set forth in *Cross,* the appellant is asking this Court to extend the duty of disclosure to procedures not recommended by the physician.

*Hicks,* 212 W.Va. at 335, 571 S.E.2d at 325 (emphasis and footnote added). In assessing the allegations before us, we find that, as in *Hicks,* this case does not involve a choice between two treatments despite petitioner's zealous attempts to persuade us otherwise. The type of cause of action urged by petitioner would create liability for a physician's failure to fully inform a patient of all available, medically-indicated treatment options. It suggests a scenario where the physician is presented with two or more divergent—and potentially mutually exclusive—distinct courses of treatment which are designed to be curative, ameliorative, or preventative, which the physician negligently fails to fully present to the patient as an array of viable, medically-indicated optional treatments. However, the case *sub judice* does not present such a scenario. Rather, it is clear that admitting Mr. Cline to the hospital for observation, monitoring and "conservative" measures was not a decisive "method of treatment" divergent from or mutually exclusive of administration of thrombolytics, but was rather part of general medical care. Had respondent determined in her medical judgment that thrombolytics were appropriate, common sense dictates that she would have likewise admitted Mr. Cline to the ICU, where he would have been provided the same "conservative measures," and simply ordered the administration of the medication as well. As in *Hicks,* it is respondent's failure to recommend a treatment that is the crux of petitioner's case. This is precisely the type of allegation which does not implicate informed consent, as set forth in *Hicks.*

The continued wisdom of our holding in *Hicks* is apparent. To suggest that respondent—or any physician—had a duty to obtain informed consent for a non-recommended treatment modality is nonsensical and creates an unnecessary and untenable basis of liability against a physician. If thrombolytics were a viable and medically appropriate treatment for Mr. Cline, respondent's failure to administer the medication would give rise to a claim for medical negligence, as was, in fact, alleged in the complaint but unsupported by a screening certificate of merit. *See supra* n. 4. If thrombolytics were *not* medically indicated for Mr. Cline in the medical judgment of the respondent, then she had no duty to advise petitioner or her decedent about such treatment. Such a requirement would force physicians to describe and discuss treatment options that they have no intention of administering even if, after discussion, the patient would select it.

■ The doctrine of informed consent is a nebulous one complicated by semantics. However, quality physician-patient communication and the duty of disclosure occasioned by the doctrine of informed consent are not necessarily coextensive. Informed consent is implicated in situations which run the gamut from procedures to which a patient never agreed at all, to treatments, the medical implications of which were not fully communicated. Informed consent necessarily implicates the treatment selection process by its very nature. However, to extend the duty of informed consent, as requested by petitioner, into treatment option availability determinations—which are necessarily driven by medical judgment—beyond the scope of a patient's treatment selection choice bleeds the concept into an area governed by the general principles of competent medical practice. Informed consent is required for a particularized, selected procedure or treatment modality which is affirmatively elected by the patient. A breach of the standard of care by

---

**6.** To illustrate the semantics which unnecessarily confound this case, petitioner suggests that simply monitoring Mr. Hicks with diagnostic radiographic studies constituted an alternative method of addressing plaintiff's susceptibility to developing blood clots and therefore *Hicks* actually *did* involve a chosen "method of treatment."

a physician in an area outside of the narrow construct of a physician's duty of disclosure as to a recommended medical treatment or procedure may well be equally actionable, but sounds in traditional medical negligence.

■ Although not referenced by this Court in *Hicks*, the *Vandi* court left open the possibility of a cause of action based upon non-disclosure of a non-recommended treatment. The court noted: "In an appropriate case there may be evidence that would support the conclusion that a doctor should have disclosed information concerning a nonrecommended procedure." *Vandi*, 9 Cal. Rptr.2d at 468. Like the *Vandi* court, we also recognize that under certain circumstances the failure of a physician to advise his patient about medically indicated alternative treatments may potentially form the basis of a cause of action. However, in full consonance with Syllabus Point 5 of *Cross*, expert testimony would unquestionably be necessary to establish that such alternatives were medically reasonable and should have been presented to the patient.[7] To that end, a screening certificate of merit would be required to comply with the MPLA's pre-suit requirements. However, we need not fully develop a framework for such a cause of action inasmuch as petitioner's case does not legitimately present such a case and raises the specter of this type of action simply to escape the pre-suit requirements of the MPLA.

■ Having determined that petitioner did not plead a recognized informed consent claim, we need not address whether informed consent qualifies as a "well-established legal theory of liability which does not require

expert testimony supporting a breach of the applicable standard of care," concomitantly obviating the need for a screening certificate of merit. Per our holding in *Hicks*, we find that the cause of action alleged by petitioner requires her to prove that the failure to recommend thrombolytics violated the applicable standard of care. To the extent that this court has not yet formally articulated the rule recognized in *Hicks*, we now hold that the duty of disclosure set forth in *Cross v. Trapp*, 170 W.Va. 459, 294 S.E.2d 446 (1982), is predicated upon a recommended treatment or procedure. The jury must assess a physician's failure to recommend a procedure or treatment under ordinary medical negligence principles. Accordingly, we agree with the trial court that petitioner's claim is one of ordinary medical negligence and therefore required a screening certificate of merit pursuant to W. Va.Code § 55–7B–6(b).

**B.**

Having affirmed the trial court's determination that petitioner alleged a standard medical negligence case and therefore violated W. Va.Code § 55–7B–6(b) by failing to provide a pre-suit screening certificate of merit, we turn now to petitioner's final substantive assignment of error. Petitioner asserts that the trial court erroneously dismissed her case before providing her an opportunity to correct the deficiencies in her pre-suit compliance.

The MPLA requires that before an action may be filed against a health care provider, the claimant must serve

---

7. Recognizing the significance of the expert necessity language in Syllabus Point 5 of *Cross*, the United States District Court for the Southern District of West Virginia recently dismissed a similarly constructed case for failure to comply with the MPLA's pre-suit requirements. In *Sayre v. United States*, Case No. 2:09–0295, 2009 WL 4825197 (S.D.W.Va. Dec. 9, 2009), Judge Copenhaver dismissed an informed consent case for failure to supply a pre-suit screening certificate of merit. *Id.* at *4. In *Sayre*, plaintiffs alleged that the Huntington VA Medical Center failed to obtain informed consent for a colonoscopy during which Mr. Sayre suffered a perforated cecum. *Id.* at *1. In particular, plaintiffs alleged that the VA failed to make Mr. Sayre

" 'aware of the risks and potential for complications that accompany a colonoscopy.' " *Id.* at *3. In dismissing the same arguments advanced by petitioner herein, the court found that plaintiffs "overlooked a crucial aspect of the court's discussion in *Cross* " which clearly states that expert testimony is needed on certain matters including " 'the risks involved concerning a particular method of treatment.' " *Id.; id.* (quoting *Cross*, 170 W.Va. at 468, 294 S.E.2d at 455). The Court further notes that petitioner's counsel was also counsel for plaintiff in *Sayre*. As in the case *sub judice*, plaintiff therein alternatively alleged a medical negligence case arising from the perforated cecum, but provided no certificate of merit in support of that allegation either.

a notice of claim on each health care provider the claimant will join in litigation[ ] ... together with a screening certificate of merit. The screening certificate of merit shall be executed under oath by a health care provider qualified as an expert under the West Virginia Rules of Evidence[.]

W. Va.Code § 55–7B–6(b), in part.[8] The MPLA further permits a health care provider in receipt of a notice of claim to, within thirty days, state that he has a bona fide defense and/or demand pre-suit mediation.

In examining W. Va.Code § 55–7B–6, this Court has expanded the interplay between parties during this pre-suit period, permitting a health care provider who believes the notice and/or certificate of merit to be defective to make a "written request to the claimant for a more definite statement of the notice of claim and screening certificate of merit." Syl. Pt. 4, in part, *Hinchman v. Gillette*, 217 W.Va. 378, 618 S.E.2d 387 (2005). We further held that

[b]efore a defendant in a lawsuit against a healthcare provider can challenge the legal sufficiency of a plaintiff's pre-suit notice of claim or screening certificate of merit under *W. Va.Code*, 55–7B–6 [2003], the plaintiff must have been given written and specific notice of, and an opportunity to address and correct, the alleged defects and insufficiencies.

Syl. Pt. 3, *Hinchman*. Any objections not specifically set forth in response are waived. *See* Syl. Pt. 5, *id.* In establishing these procedures, we explained that this exchange furthers the purpose behind the MPLA:

[T]he statutory purpose of avoiding frivolous litigation is served by authorizing a pre-suit request for a more definite statement, because a claimant is on notice before filing any suit of potential challenges to the sufficiency of a notice of claim and screening certificate of merit, and has an opportunity to provide a modified or supplemented notice or certificate that ad-

dresses any meritorious concerns raised by the healthcare provider. The purpose of encouraging pre-trial resolution is served by authorizing a pre-suit request for a more definite statement, and by affording an opportunity to the claimant to respond to the request, because if a claimant makes a more definite statement in response to a request, the healthcare provider has more information upon which to investigate and decide whether to mediate or otherwise respond to the claim.

*Id.* at 387, 618 S.E.2d at 396. As a result, we directed that

[i]n determining whether a notice of claim and certificate are legally sufficient, a reviewing court should apply *W. Va.Code*, 55–7B–6 [2003] in light of the statutory purposes of preventing the making and filing of frivolous medical malpractice claims and lawsuits; and promoting the pre-suit resolution of non-frivolous medical malpractice claims. Therefore, a principal consideration before a court reviewing a claim of insufficiency in a notice or certificate should be whether a party challenging or defending the sufficiency of a notice and certificate has demonstrated a good faith and reasonable effort to further the statutory purposes.

Syl. Pt. 6, *id.*

As discussed more fully *supra*, petitioner's cause of action does not qualify for the exception to the screening certificate of merit, but rather constitutes traditional medical negligence, necessitating compliance with W. Va. Code § 55–7B–6(b). Given the complete absence of a screening certificate of merit, the good faith analysis established in *Hinchman* to determine its "sufficiency" is academic, at best. Regardless, the trial court determined that given petitioner's refusal to reassess the necessity of a screening certificate of merit after one was demanded by respondent, she did not demonstrate a good faith and reasonable effort to further the MPLA's statutory purposes.[9]

---

**8.** In regard to the content of the screening certificate of merit, W. Va.Code § 55–7B–6(b) states: "The screening certificate of merit ... shall state with particularity: (1) The expert's familiarity with the applicable standard of care in issue; (2) the expert's qualifications; (3) the expert's opin-

ion as to how the applicable standard of care was breached; and (4) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death."

**9.** The trial court further found that petitioner did not even "attempt" to state a well-established

Petitioner urges, however, that irrespective of the court's determination as to the sufficiency of her compliance with W. Va. Code § 55–7B–6(b), the court was obligated to provide her with an opportunity to correct this deficiency prior to dismissal. Since this Court first articulated the required good faith analysis set forth in *Hinchman*, we have had several occasions to address a trial court's dismissal for insufficient notice and/or certificate of merit. In each case, this court has carefully outlined the very specific facts of each particular case which have dictated its outcome and expressly warned future litigants to be more cautious and err on the side of full compliance with the MPLA.

In *Gray v. Mena*, 218 W.Va. 564, 625 S.E.2d 326 (2005), plaintiff failed to comply with the MPLA's pre-suit requirements because she believed her case did not fall within the MPLA. In particular, plaintiff alleged assault and battery arising out of the defendant's alleged sexual assault during an examination. *Id.* at 567, 625 S.E.2d at 329. This Court construed the case as falling within the MPLA, therefore necessitating a certificate of merit, but reversed the trial court's dismissal "[g]iven the newness of the statute" and plaintiff's counsel's "good faith, . . . legitimate judgment" that the case was not governed by the MPLA, based on Florida caselaw.[10] *Id.* at 570, 625 S.E.2d at 332. As noted above, however, our decision contained the following warning: "[W]e would strongly encourage litigants to err on the side of

caution by complying with the requirements of the Act if any doubt exists. . . . We cannot [ ] assure future litigants who fail to comply with the requirements of the Act that dismissal can be avoided." *Id.* at 571, 625 S.E.2d at 333.[11]

In *Davis v. Mound View Health Care, Inc.*, 220 W.Va. 28, 640 S.E.2d 91 (2006), this Court found that the trial court properly dismissed the case for failure to provide a certificate of merit. A new syllabus point was issued holding that a dismissal under the MPLA that did not specify that it was "with prejudice" would be deemed "without prejudice." Syl. Pt. 3, *id.*[12] As a result of holding the dismissal to be without prejudice, this Court noted that the case could be refiled pursuant to the savings statute, W. Va.Code § 55–2–18(a), which provides: "For a period of one year from the date of an order dismissing an action or reversing a judgment, a party may re-file the action if the initial pleading was timely filed and (i) the action was involuntarily dismissed for any reason not based upon the merits of the action[.]" *Davis*, 220 W.Va. at 32, 640 S.E.2d at 95. Notwithstanding, this Court found that the trial court had failed to undertake the good faith analysis required by *Hinchman*, but declined to assess whether such failure constituted error inasmuch as any such error would be harmless in light of the savings statute. *Id.*

theory of liability until she responded to respondent's Motion to Dismiss. Although we note that petitioner appeared to be positioning her claim as an informed consent claim from the outset, we agree that *petitioner's summary response to respondent's objection to the absence of a screening certificate of merit did not reflect any of the arguments advanced by petitioner after the deficiency was formally attacked post-suit.*

10. Florida has a statutory scheme similar to the MPLA and its courts determined that a case such as *Gray's* did not fall within its construct. This Court has found Florida's caselaw arising under the statute as "instructive and persuasive." *Gray*, 218 W.Va. at 569, 625 S.E.2d at 331 (quoting *Hinchman*, 217 W.Va. at 384, 618 S.E.2d at 393).

11. As indicia of the import of our warning, in *Blankenship v. Ethicon, Inc.*, 221 W.Va. 700, 708, 656 S.E.2d 451, 459 (2007), we noted that al-

though the trial court may have properly dismissed a case that was determined to fall under the MPLA for failure to provide a certificate of merit, the parties did not have the benefit of the Court's warning in *Gray. Gray* had not yet been decided at the time *Blankenship* was in its pre-suit period; as such, the dismissal was reversed.

12. Syllabus Point 3 of *Davis* provides:

Where a medical malpractice action is dismissed for failure to comply with the pre-suit notice of claim provision set forth in W. Va.Code § 55–7B–6(b) (2003) and the dismissal order does not specify the dismissal to be with prejudice, the dismissal is deemed to be without prejudice. In such a case, the medical malpractice action may be re-filed pursuant to W. Va.Code § 55–2–18 (2001) after compliance with the pre-suit notice of claim and screening certificate of merit provisions of W. Va.Code § 55–7B–6 (2003).

Finally, in *Westmoreland v. Vaidya,* 222 W.Va. 205, 664 S.E.2d 90 (2008)(per curiam), this Court reversed dismissal of a medical malpractice case filed without a certificate of merit on the basis that the *pro se* plaintiff relied in good faith on W. Va.Code § 55–7B–6(c) [13] and that he had no notice prior to the dismissal that he would not be permitted to rely on subsection (c). Again, however, the Court warned of the limited scope of our ruling: "We caution litigants, however, that it is the unique case that will qualify for good faith reliance on W. Va.Code § 55–7B–6(c). An ignorance of the mandates or a failure to comply, without more, will not suffice to provide litigants a second chance to provide a certificate of merit." *Id.* at 212 n. 14, 664 S.E.2d at 97 n. 14 (2008).

Petitioner relies upon *Westmoreland* in support of her contention that established precedent requires a plaintiff to be given an opportunity, prior to dismissal, to correct any deficiencies in her pre-suit requirements. In particular, petitioner cites to the inclusion of Syllabus Point 4 of *Daniel v. Charleston Area Med. Ctr., Inc.* 209 W.Va. 203, 544 S.E.2d 905 (2001) in the Court's opinion in *Westmoreland.* In so arguing, petitioner takes great liberty with the context in which *Daniel* was utilized, misconstrues its significance to the decision in *Westmoreland,* and fails to note the factual distinctions presented in that case.

In *Westmoreland,* this Court determined that the plaintiff in that case had made a good faith and reasonable effort to further the statutory purpose of the MPLA and therefore should be provided a reasonable period of time to provide a screening certificate of merit before dismissal. In discussing what constitutes a "reasonable period of time," the Court noted that we had previously found thirty days to be reasonable. In support of that general discussion, the Court cited Syllabus Point 6 of *State ex rel. Weir-*ton Med. Ctr. v. Mazzone,* 214 W.Va. 146, 587 S.E.2d 122 (2002), which syllabus point originated in *Daniel v. Charleston Area Medical Center,* 209 W.Va. 203, 544 S.E.2d 905 (2001), which states: " 'Upon a trial court's determination that an expert witness is required to prove standard of care or proximate cause in an action brought under the [MPLA] ... a reasonable period of time must be provided for retention of an expert witness.' Syllabus Point 4, *Daniel v. Charleston Area Medical Center, Inc.,* 209 W.Va. 203, 544 S.E.2d 905 (2001)." *Westmoreland,* 222 W.Va. at 212, 664 S.E.2d at 97 (quoting Syl. Pt. 6, *Weirton Med. Ctr.*).

First and most importantly, both *Weirton Medical Center* and *Daniel* were decided prior to the revisions to the MPLA and involved a now non-existent provision in the 2000 statute which required the plaintiff, at a mandatory status conference, to certify whether an expert was necessary to testify as to a breach of the standard of care, but providing plaintiff a reasonable amount of time to obtain an expert if the court disagreed.[14] As such, the language quoted therefrom in *Westmoreland* is not an accurate statement of the law as the statute is presently constituted. Secondly, the language from *Daniel* was cited in support of the determination that in that particular case and under its particular circumstances, the petitioner should have been given a reasonable amount of time to fulfill the pre-suit requirements prior to dismissal—not as a precedential holding dictating the outcome of the case. Finally, it is clear that our decision in *Westmoreland* to provide petitioner with an opportunity to correct his pre-suit deficiencies was borne out of the fact that petitioner was *pro se,* relied in good faith on the applicability of W. Va.Code § 55–7B–6(c), and was provided no pre-suit objection and opportunity to correct his misplaced reliance on subsection (c).

---

**13.** Appellant's case was based on an incident where defendant was performing a painful procedure on him and he repeatedly told him to stop; defendant physically restrained him and told him to "quit being a baby" and completed the procedure. Along with medical malpractice, plaintiff alleged medical battery and other intentional torts. Plaintiff explained that he did not obtain a certificate of merit because no local experts would sign it and "the common person would not need to have an expert verify the breech [sic] of [the] standard of care[.]" *Westmoreland,* 222 W.Va. at 213, 664 S.E.2d at 98.

**14.** W. Va. Code § 55–8B–6(a)(1)–(2) (1986)(Repl. Vol. 2000).

The instant case certainly does not present the "unique case" illustrated in *Westmoreland*. Petitioner had multiple opportunities, both pre- and post-suit to correct her deficient pre-suit compliance, but refused to do so. Her refusal to do so, as discussed *supra*, was based on a very narrow reading of *Cross* and her contention that *Hicks* should be overruled. Most importantly for purposes of our analysis, however, the circuit court's dismissal was without prejudice. Like the plaintiff in *Davis*, petitioner was free to refile her complaint pursuant to the savings statute after complying with the pre-suit requirements of the MPLA. The circuit court properly undertook the good faith analysis set forth in *Hinchman* and inasmuch as its dismissal was without prejudice, the court did not "restrict or deny citizens' access to the courts." *Hinchman*, 217 W.Va. at 385, 618 S.E.2d at 394.

While this Court has made clear that the pre-suit requirements should not be used to make suits under the MPLA a "game of forfeits," the pre-suit objection procedure was specifically established to give the plaintiff "an opportunity to address and correct[ ] the alleged defects and insufficiencies." *Hinchman*, 217 W.Va. at 385, 618 S.E.2d at 394; *id.* at 386, 618 S.E.2d at 395. This Court further noted that "there would seem to be no sense or utility in allowing amendment of a pre-suit notice and certificate *after* suit is filed" since its purpose is to avert frivolous claims and promote pre-suit resolution. *Id.*, 217 W.Va. at 385–86, 618 S.E.2d at 394–95.[15] As illustrated above, this Court has been exceedingly protective of a litigant's access to the courts under the MPLA, reversing draconian results which prevented litigation of otherwise meritorious claims; however, commensurately, we have expressly and repeatedly warned litigants to err on the side of caution in complying with the MPLA. Therefore, this Court can hardly discern any reversible error when a trial court applies the plain language of the statute and our caselaw, which application properly results in dismissal, but with no discernable prejudice to the litigant.

## IV. CONCLUSION

Based upon the foregoing, this Court finds that the Circuit Court of Kanawha County committed no reversible error. Therefore, the final order dated February 3, 2011, is affirmed.

Affirmed.

---

15. Petitioner expresses concern that by imposing some obligation to react in response to defendant's "raise or waive" pre-suit objections about the sufficiency of the notice or certificate, plaintiffs will be subject to the whims of the defense bar. We believe such concern is mitigated by the language in *Hinchman* which requires *both* parties to demonstrate good faith in "challenging or defending" the sufficiency of pre-suit notice and certificate. Syl. Pt. 6, in part, *id.*