STATE OF WEST VIRGINIA

**Marissa Shaffer and Timothy Shaffer,**
**Plaintiffs Below, Petitioners**

**vs.)  No. 19-0305**      (Kanawha County 17-C-343)

**William Bragg, M.D., General**
**Anesthesia Services, Inc., and**
**Charleston Area Medical Center, Inc.,**
**Defendants Below, Respondents**

**FILED**
**October 13, 2020**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioners Marissa and Timothy Shaffer, by counsel Alex McLaughlin, appeal two orders entered in the Circuit Court of Kanawha County on February 25, 2019, that granted summary judgment in favor of William Bragg, M.D., and his anesthesiology practice, General Anesthesia Services, Inc. ("GAS"), and in favor of Charleston Area Medical Center, Inc. ("CAMC"). Dr. Bragg and GAS, by counsel Edward C. Martin and Amy Rothman Malone, and CAMC, by counsel D.C. Offutt, Jr., and Jody O. Simmons, each filed a response. Petitioners submitted a reply.

This Court has considered the briefs, record on appeal, and pertinent legal authority, as well as the oral arguments presented to this Court by the parties. Upon consideration of the same, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the orders of the circuit court is appropriate under Rule 21 of the Rules of Appellate Procedure.

### Facts and Procedural History

On January 22, 2015, Mrs. Shaffer was admitted to CAMC Women and Children's Hospital for the labor and delivery of her first child. Mrs. Shaffer had pre-registered at CAMC on October 7, 2014, at which time she reviewed and signed a "Patient Agreement" that stated, inter alia, "I understand that CAMC is a teaching hospital, and that students in the health care sciences and resident physicians may observe and participate in my treatment under supervision[,]" and, further, "I generally consent to be treated at CAMC; however, I understand that I still have the right to refuse any specific procedure or treatment when it is offered."

While she was in labor, Mrs. Shaffer requested an epidural for pain. She was first seen by Garry Chapman, a registered nurse anesthetist student at CAMC's School of Nurse Anesthesia. Though Mr. Chapman testified that he did not specifically recall participating in Mrs. Shaffer's

case, he testified that it was his practice to introduce himself to the patient as a student who was helping the anesthesiologist, take the patient's history, prepare the pre-procedural paperwork, "ask them questions and ask them if they have any questions" and "do the physical assessment and all the things that are necessary for the pre[-]anesthesia record." He acknowledged that his signature appeared on Mrs. Shaffer's pre-anesthesia record.

Shortly thereafter, Dr. Bragg entered Mrs. Shaffer's room. He testified that, although he did not specifically recall his conversation with Mrs. Shaffer, it is his practice to obtain informed consent from the patient and to go over the risks of the procedure. He testified that he explained to Mrs. Shaffer that Mr. Chapman would be observing the epidural placement. Mrs. Shaffer testified that although Dr. Bragg did not review the risks of the procedure with her, she consented to the epidural and signed an "Acknowledgement of Consent of Anesthesia" that stated, inter alia, "I hereby request and authorize Doctor Bragg and/or any physicians employed or contracted by GAS, Inc. to provide anesthesia for my surgery or procedure[,]" and further, "My questions about anesthesia have been answered, and I believe that I have enough information to give this informed consent."

Dr. Bragg commenced the procedure of placing the lumbar epidural by numbing Mrs. Shaffer's back and "got the needle started in the correct trajectory." He permitted Mr. Chapman to advance the needle in order to feel for loss of resistance, which is the sensation the anesthesia provider feels when the tip of the epidural needle enters the epidural space. According to Dr. Bragg, Mr. Chapman "made an attempt to advance the needle unsuccessfully, at which point I took over." Upon advancing the needle, it punctured the protective covering over the spinal cord (known as the dura mater), causing spinal fluid to leak through the dural puncture. This complication is known as a "wet tap." It was Dr. Bragg's testimony that it was he who "advanced the needle, and that's when the wet tap occurred. The needle was in my hands at the time the wet tap occurred." In contrast to Dr. Bragg's testimony, petitioners testified that, based upon the conversation they heard between Dr. Bragg and Mr. Chapman during the placement of the epidural, they believed that it was Mr. Chapman who caused the wet tap. Gerald Bushman, M.D., an anesthesiologist and petitioners' expert witness, discounted petitioners' version of events, explaining that, based upon where Mr. Shaffer was standing (in front of Mrs. Shaffer) and where and how Mrs. Shaffer was sitting (with her back to both Dr. Bragg and Mr. Chapman) petitioners could not know "at what point Dr. Bragg took the needle over from Mr. Chapman, but she knows what she heard. And so she's making simply a very subtle leal[p] in assuming something that actually she couldn't possibly know." Dr. Bushman testified that the epidural needle was in Dr. Bragg's hands when the wet tap occurred and that it was Dr. Bragg (rather than Mr. Chapman) who caused the wet tap. For his part, Mr. Chapman stated in a sworn affidavit filed in connection with this case that "[a]s a [Certified Registered Nurse Anesthetist] student at [CAMC], I never placed an epidural[,]" and further, "I did not place Marissa Shaffer's epidural on January 22, 2015[.]"

Following her discharge from CAMC, Mrs. Shaffer continued to suffer the effect of the wet tap – that is, a post-dural puncture headache for which she received blood patch treatments, which was explained by CAMC in its brief as "a procedure where a small amount of blood is taken from the patient and inserted into the epidural space to seal the hole created by the wet tap." The headache eventually resolved. Thereafter, Mrs. Shaffer contacted CAMC concerning charges

2

billed to her in connection with the treatment for the wet tap. According to the deposition testimony of Dawn Duffield (formerly Schoolcraft), then Associate Administrator at Women and Children's Hospital, Mrs. Shaffer indicated that it was her "understanding that a student was involved in her care, and because of that she had a complication from the epidural and she didn't feel she should have to pay for the follow-up care [in the emergency department] for the complication." Mrs. Duffield testified that she commenced an investigation into the matter, including contacting personnel on both the clinical and operational sides of the hospital. In a March 20, 2015, follow-up letter to Mrs. Shaffer, Mrs. Duffield stated, "You indicated that you were billed for follow up from an epidural complication performed by a student. . . . A review of your visit was conducted and we found that no student was involved in the epidural placement." The letter acknowledged that CAMC may not have clearly communicated to Mrs. Shaffer its standard procedure to direct patients with a known complication from an epidural to the general anesthesia holding area (rather than the emergency department) for a blood patch for which there is no separate charge. Mrs. Duffield's letter advised Mrs. Shaffer that the charges associated with her emergency room visit would be waived. During her subsequent deposition testimony, Mrs. Duffield clarified that, based upon what actually transpired, it would have been more "appropriate[]" to state that "the student did not cause the wet tap."

On March 10, 2017, petitioners, individually, and as guardians of their minor child, T.S., filed a complaint in the Circuit Court of Kanawha County against respondents pursuant to the West Virginia Medical Professional Liability Act, *see* W. Va. Code §§ 55-7B-1 to -12, alleging claims of lack of informed consent based upon respondents' failure to inform Mrs. Shaffer that a "trainee would participate in the epidural placement," and medical negligence. Petitioners also sought "[e]xemplary [d]amages for [i]mproper [d]ocumentation, [c]over [u]p, and [c]oncealment" for respondents' alleged failure to document or admit the presence, identity, or participation of Mr. Chapman in the placement of Mrs. Shaffer's epidural. Additionally, petitioners alleged that, as a result of the wet tap, Mrs. Shaffer suffered extreme headaches for approximately eight days following the procedure and that, during that time, she was unable to care for or breastfeed her newborn child and that she currently suffers from post-traumatic stress disorder and depression. Mr. Shaffer alleged a claim for loss of consortium and, with regard to the minor child, T.S., petitioners alleged that Mrs. Shaffer's inability to breastfeed caused T.S. to "suffer[] in his bond with his mother" and "deprived [him] of the well-published benefits of breastfeeding."

Respondents subsequently filed motions for partial summary judgment as to the claims or injuries to T.S. and as to punitive damages.[1] In an order entered on May 29, 2018, the circuit court granted respondents' motion as to petitioners' claims regarding T.S., granted Dr. Bragg and GAS's motion regarding punitive damages, and determined that CAMC's motion for partial summary judgment on punitive damages would be taken under advisement.[2]

---

[1] Respondents' motions for partial summary judgment were not made a part of the appendix record.

[2] The circuit court's May 29, 2018, order noted that the motions were granted based upon petitioners' representation to the court that they did not intend to pursue their claims on behalf of T.S. against all respondents or their punitive damages claim against Dr. Bragg and GAS.

3

Respondents thereafter filed their respective motions for summary judgment, arguing that the testimony of petitioners' own expert established that Mrs. Shaffer's wet tap was not caused by a deviation of the standard of care of epidural placement but, rather, is a known complication of that procedure. While Dr. Bushman would have removed the epidural needle when Mr. Chapman could not feel loss of resistance to locate the epidural space, he testified that there is no standard of care within the field of anesthesiology requiring Dr. Bragg to do so. According to Dr. Bushman's deposition testimony, Dr. Bragg was not medically negligent in causing the wet tap.

With regard to petitioners' informed consent claim, Dr. Bushman testified that the standard of care for informed consent in this case required that the anesthesiologist advise the patient as follows:

> I'm working with this person [i.e., the student]. I'm teaching [him] how to do an epidural. Is that all right to do under my supervision for you? I'll be responsible for it, but I'm teaching this person so that they will know how to take care of patients ongoing. And they [i.e., the patient] have the right to say, no, I want you to do it yourself.

Although Dr. Bushman testified that the risk of a wet tap is significantly higher when the epidural needle is placed by a trainee such as Mr. Chapman than by an experienced anesthesia provider such as Dr. Bragg, Dr. Bushman specifically testified that the informed consent process did not require Dr. Bragg to tell Mrs. Shaffer about this increased risk. Further, when asked, without objection from petitioners, whether he "agree[d] that nothing about the informed consent process caused the wet tap[,]" Dr. Bushman answered affirmatively.

Following a hearing on respondents' summary judgment motions on January 22, 2019, the circuit court entered orders on February 25, 2019, that granted respondents' respective motions. As to Dr. Bragg and GAS, the circuit court concluded that, based upon Dr. Bushman's expert testimony, Mrs. Shaffer's wet tap was not caused by a deviation of the standard of care in epidural placement, that Dr. Bragg was not negligent in his placement and performance of Mrs. Shaffer's epidural, and that, as a result, petitioners failed to prove all of the elements of its medical negligence claim against Dr. Bragg and GAS. With regard to petitioners' claim that Dr. Bragg deviated from the standard of care in the informed consent process, the circuit court found that Dr. Bragg deviated from the standard of care by failing to inform Mrs. Shaffer that Mr. Chapman was going to be performing part of her epidural. However, the court also found that Dr. Bushman opined that "nothing about the informed consent process caused the wet tap[,]" and that, based upon this testimony, "the alleged deviation from the standard of care during the informed consent process by Dr. Bragg did not cause or contribute to M[r]s. Shaffer's wet tap."

Similarly, in a separate order granting CAMC's motion for summary judgment, the circuit court concluded that petitioners failed to prove the essential elements of their medical negligence claim against CAMC and, as to petitioners' informed consent claim, although Dr. Bushman testified that Dr. Bragg deviated from the standard of care for informed consent, "Dr. Bushman did not testify that CAMC or [Mr.] Chapman deviated from the standard of care regarding the informed consent process." The court again concluded that, based upon Dr. Bushman's expert testimony, "nothing about the informed consent process caused the wet tap. In other words, Dr. Bushman did not link the deviation from the standard of care during the informed consent process

to the cause of M[r]s. Shaffer's alleged injuries." Finally, as to petitioners' claim for punitive or exemplary damages, the circuit court concluded that "CAMC's alleged untruthfulness and 'cover up' of [Mr.] Chapman[']s involvement in the placement of the epidural did not cause or contribute to any of M[r]s. Shaffer's alleged injuries."

Petitioners now appeal the circuit court's summary judgment orders insofar as they concluded that petitioners' informed consent claims against respondents and their claim for punitive damages against CAMC fail as a matter of law. Petitioners do not appeal the circuit court's conclusions that the wet tap was not caused by a deviation from the standard of care for epidural placement and was, therefore, not the result of medical negligence.

**Standard of Review**

On appeal, this Court accords a plenary review to the circuit court's orders granting summary judgment: "[a] circuit court's entry of summary judgment is reviewed *de novo*." Syl. Pt. 1, *Painter v. Peavy,* 192 W. Va. 189, 451 S.E.2d 755 (1994). In conducting our de novo review, we apply the same standard for granting summary judgment that is applied by the circuit court. Under that standard,

> "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. Pt. 3, *Aetna Cas. & Sur. Co. v. Fed. Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).

> "Summary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove." Syl. Pt. 4, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

Syl. Pts. 1 and 2, *Woods v. Jefferds Corp.,* 241 W. Va. 312, 824 S.E.2d 539 (2019).

**Discussion**

In their first assignment of error, petitioners argue that the circuit court erred in concluding that their expert, Dr. Bushman, failed to causally connect Dr. Bragg's deviation from the standard of care for informed consent to Mrs. Shaffer's injuries. They contend that the risk of wet tap increased due to Mr. Chapman's involvement in the epidural placement and that, by failing to inform Mrs. Shaffer that Mr. Chapman would be participating, Dr. Bragg deprived her of the opportunity to decline the procedure. Petitioners complain that the circuit court improperly disregarded the totality of Dr. Bushman's testimony in this regard in favor of Dr. Bushman's affirmative response to one question, "Do you agree that nothing about the informed consent process caused the wet tap?" We find no error.

> "Although expert medical testimony is not required under the patient need standard to establish the scope of a physician's duty to disclose medical information

5

to his or her patient, expert medical testimony would ordinarily be required to establish certain matters including: (1) the risks involved concerning a particular method of treatment, (2) alternative methods of treatment, (3) the risks relating to such alternative methods of treatment and (4) the results likely to occur if the patient remains untreated." Syl. Pt. 5, *Cross v. Trapp,* 170 W.Va. 459, 294 S.E.2d 446 (1982).

Syl. Pt. 4, *Cline v. Kresa-Reahl*, 229 W. Va. 203, 728 S.E.2d 87 (2012).

Dr. Bushman testified that the standard of care for informed consent did not require Dr. Bragg to tell Mrs. Shaffer that there is "an increased risk of wet tap in a trainee's hands" and, further, that "nothing about the informed consent process caused the wet tap[.]" Moreover, Dr. Bushman testified that Dr. Bragg (and not Mr. Chapman) caused the wet tap. Because the standard of care for informed consent did not require Dr. Bragg to inform Mrs. Shaffer that Mr. Chapman's participation in the epidural placement increased the risk of a wet tap and because it was Dr. Bragg who caused the wet tap, we find no error in the circuit court's conclusion that the deviation from the standard of care for informed consent did not cause Mrs. Shaffer's injuries. Therefore, under the unique facts of this case, we find that the circuit court's order granting summary judgment in favor of Dr. Bragg and GAS was not made in error.

In their second assignment of error, petitioners argue that the circuit court erred in concluding that the evidence failed to show that CAMC deviated from the standard of care for informed consent. They contend that, to the contrary, Dr. Bushman opined that CAMC is responsible for informed consent with respect to its health care students who provide care to patients at CAMC; that, in this particular case, "in providing a trainee to do the procedure without consent or documentation of participation . . . [CAMC] [was] responsible for [Mr. Chapman's] activity, including the complication [i.e., the wet tap]"; and that respondents' expert, John Sullivan, M.D., agreed with Dr. Bushman's opinion in this regard. We find no error. Regardless of whether there was evidence that CAMC deviated from the standard of care for informed consent, as we concluded above, the deviation from the standard of care for informed consent did not cause Mrs. Shaffer's injuries. Therefore, the circuit court's order granting summary judgment in favor of CAMC on the issue of informed consent was not made in error.

In their final assignment of error, petitioners argue that the circuit court erred in concluding that there was no evidence to support a tort of outrage claim against CAMC. Petitioners contend that CAMC's conduct – including its letter to Mrs. Shaffer in which it denied that a student was involved in her epidural placement and Mr. Chapman's denial that he participated in the procedure – satisfied the elements of such a claim.

Petitioners' assignment of error is fundamentally flawed because the circuit court's summary judgment order includes no findings or conclusions with regard to the tort of outrage. Indeed, petitioners' complaint failed to allege such a claim. Rather, their complaint sought "[e]xemplary [d]amages for [i]mproper [d]ocumentation, [c]over-[u]p, and [c]oncealment" for CAMC's alleged failure to keep proper records of Mr. Chapman's presence, identity, and

6

involvement in Mrs. Shaffer's epidural procedure.[3] To the extent such a claim has ever been raised in this case, in their response to respondents' motion for summary judgment, petitioners generally stated that

> there is a separate action for compensatory and punitive damages caused by [CAMC's] pattern of lying to [Mrs.] Shaffer months after the [wet tap] occurred . . . . Although it has been pled primarily as a basis for punitive damages, rather than as a separate cause of action, it is clear that all of the elements of the tort of outrage (or intentional infliction of emotional distress) are satisfied.

In that pleading, petitioner failed to identify or address the elements of the tort of outrage and, indeed, made no effort to explain how, as they now contend, "all of the elements" of such a claim have been satisfied by the evidence.[4] Petitioners have failed similarly on appeal. We have cautioned that "'[a]lthough we liberally construe briefs in determining issues presented for review, issues which are . . . not supported with pertinent authority[] are not considered on appeal.'" *State v. Lambert*, 236 W. Va. 80, 100, 777 S.E.2d 649, 669 (2015) quoting *State v. LaRock,* 196 W.Va. 294, 302, 470 S.E.2d 613, 621 (1996).[5] Based upon the foregoing, we decline to consider petitioners' assignment of error relating to a claim for the tort of outrage.

For the foregoing reasons, we affirm.

---

[3] As previously noted, with respect to petitioners' claim for punitive or exemplary damages, the circuit court's summary judgment order concluded that "CAMC's alleged untruthfulness and 'cover up' of [Mr.] Chapman[']s involvement in the placement of the epidural did not cause or contribute to any of M[r]s. Shaffer's alleged injuries."

[4] In syllabus point three of *Travis v. Alcon Laboratories, Inc.*, 202 W. Va. 369, 504 S.E.2d 419 (1998), this Court established the elements of a claim for intentional or reckless infliction of emotional distress, which is also known as the tort of outrage:

> In order for a plaintiff to prevail on a claim for intentional or reckless infliction of emotional distress, four elements must be established. It must be shown: (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

[5] Additionally, we note that, in their reply brief on appeal, petitioners posit that "technical deficiencies in a pleading, such as a complaint, are very often cleaned up at the circuit court level through the broad discretion given to circuit court's [sic] to permit amendments to the complaints." However, petitioners do not represent that they have, at any time in these proceedings, requested an amendment to their complaint in order to add a tort of outrage claim. *See* W. Va. R. Civ. P. 15 (stating, inter alia, that "a party may amend the party's pleading only by leave of court or by written consent of the adverse party").

Affirmed.

**ISSUED:**  October 13, 2020

**CONCURRED IN BY:**

Chief Justice Tim Armstead
Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Evan H. Jenkins
Justice John A. Hutchison